# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC,** | § § § | |
| **Plaintiffs,** | § § | **Civil Action No. 3:25-cv-02885-L-BN** |
| **v.** | § § | **Consolidated with 3:25-cv-03097-L** |
| **SOUTHWEST AIRLINES CO.,** | § § | **JURY TRIAL DEMANDED** |
| **Defendant.** | § § § | |

---

## DEFENDANT SOUTHWEST AIRLINES CO.'S BRIEF IN SUPPORT OF RULE 12(b)(6) MOTION TO DISMISS

---

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................... 1

II.   ARGUMENTS................................................................................................................ 2

      A.    Five of the Asserted Patents Are Invalid Under 35 U.S.C. § 101 and *Alice*
            Because They Are Software Patents Claiming Abstract Ideas Implemented
            on Generic Hardware. ......................................................................................... 2

            1.    U.S. Patent No. 7,257,582 Claims First-Come/First-Serve
                  Processing—A Longstanding Queuing Technique That Predates
                  Computers. .............................................................................................. 4

                  a.    Claim 1 Is Directed to an Abstract Queue Management
                        Technique. .................................................................................. 5

                  b.    Claim 1 Lacks an Inventive Concept and Claims Only
                        First-Come/First Served Processing on Generic Hardware. ........... 7

            2.    U.S. Patent Nos. 8,332,844 and 7,721,282 Claim Root-Leaf
                  Storage for Organizing and Storing Information—A Fundamental
                  Information-Organization Paradigm......................................................... 8

                  a.    Claims 1 and 7 Are Directed to Organizing and Storing
                        Information. .............................................................................. 10

                  b.    Claims 1 and 7 Lack an Inventive Concept and Merely
                        Claim the Use of Generic Hardware to Organize and Store
                        Information. .............................................................................. 11

            3.    U.S. Patent No. 8,407,722 Claims Transferring Information
                  Through Digital Networks to Registered Clients—A Longstanding
                  Subscription-and-Delivery Practice......................................................... 13

                  a.    Claim 14 Is Directed to the Abstract Idea of Subscription-
                        Based Content Distribution to Registered Recipients.................. 14

                  b.    Claim 14 Lacks an Inventive Concept and Only Claims
                        Delivering Updated Content to Registered Clients Using
                        Generic Hardware. ...................................................................... 16

            4.    U.S. Patent No. 7,712,080 Claims Distributed Parallel
                  Computing—A Fundamental Divide-And-Conquer Technique
                  Applied to Computing Tasks. ................................................................ 17

                  a.    Claim 1 Is Directed to the Abstract Idea of Distributed
                        Parallel Computing. ................................................................... 18

                  b.    Claim 1 Lacks an Inventive Concept That Goes Beyond
                        Applying the Divide-and-Conquer Strategy on Generic
                        Hardware.................................................................................... 20

      B.    Pre-suit Damages Are Not Available Because IV Has Not Pleaded
            Compliance With the Marking Statute, 35 U.S.C. § 287...................................... 21

C.    The Complaint Allegations Are Insufficient Because They Fail to Identify Unlicensed Infringing Uses of the Accused Technologies. .................................. 23

III.    CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018)...................................................................3

*Addiction & Detox. Inst. L.L.C. v. Carpenter*,
  620 F. App'x 934 (Fed. Cir. 2015) ........................................................23, 24

*Affinity Labs of Tex., LLC v. DIRECTV, LLC*,
  838 F.3d 1253 (Fed. Cir. 2016)...................................................................5

*Alice Corp. v. CLS Bank Int'l*,
  573 U.S. 208 (2014)........................................................................ *passim*

*Apple, Inc. v. Ameranth, Inc.*,
  842 F.3d 1229 (Fed. Cir. 2016)...................................................................3

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
  876 F.3d 1350 (Fed. Cir. 2017)..................................................................21

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
  950 F.3d 860 (Fed. Cir. 2020)...................................................................22

*Artrip v. Ball Corp.*,
  735 F. App'x 708 (Fed. Cir. 2018) .............................................................24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................2

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................2, 25

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018)...................................................................3

*Bot M8 LLC v. Sony Corp.*,
  4 F.4th 1342 (Fed. Cir. 2021) ................................................................6, 23

*BSG Tech. L.L.C. v. Buyseasons, Inc.*,
  899 F.3d 1281 (Fed. Cir. 2018)......................................................5, 7, 12, 16

*CardioNet, LLC v. InfoBionic, Inc.*,
  955 F.3d 1358 (Fed. Cir. 2020)...................................................................5

*Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*,
  906 F. Supp. 2d 399 (W.D. Pa. 2012)...........................................................22

iii

*Celgard, LLC v. Shenzhen Senior Tech. Material Co.*,
 2020 WL 7392909 (W.D.N.C. Dec. 17, 2020) ....................................................................24

*ChargePoint, Inc. v. SemaConnect, Inc.*,
 920 F.3d 759 (Fed. Cir. 2019) .............................................................................10, 21

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
 776 F.3d 1343 (Fed. Cir. 2014) ................................................................10, 11, 12, 15

*CTD Networks, LLC v. Google, LLC*,
 688 F. Supp. 3d 490 (W.D. Tex. 2023) ..............................................................................25

*Customedia Techs., LLC v. Dish Network Corp.*,
 951 F.3d 1359 (Fed. Cir. 2020) ......................................................................................5

*e-Watch Inc. v. Avigilon Corp.*,
 2013 WL 5231521 (S.D. Tex. Sept. 13, 2013) ..................................................................21

*Elec. Power Grp., LLC v. Alstom S.A.*,
 830 F.3d 1350 (Fed. Cir. 2016) .......................................................................... *passim*

*Int'l Bus. Machines Corp. v. Zillow Group, Inc.*,
 50 F.4th 1371 (Fed. Cir. 2022) .....................................................................................15

*Intell. Ventures I LLC v. Capital One Bank (USA)*,
 792 F.3d 1363 (Fed. Cir. 2015) ..................................................................................5, 14

*Intell. Ventures I LLC v. Erie Indem. Co.*,
 850 F.3d 1315 (Fed. Cir. 2017) ...............................................................................10, 11

*Intell. Ventures I LLC v. Symantec Corp.*,
 838 F.3d 1307 (Fed. Cir. 2016) ..................................................................................7, 12

*Internet Pats. Corp. v. Active Network, Inc.*,
 790 F.3d 1343 (Fed. Cir. 2015) .........................................................................................3

*Interval Licensing LLC v. AOL, Inc.*,
 896 F.3d 1335 (Fed. Cir. 2018) ......................................................................................16

*JVC Kenwood Corp. v. Nero, Inc.*,
 797 F.3d 1039 (Fed. Cir. 2015) ......................................................................................24

*Lans v. Digital Equip. Corp.*,
 252 F.3d 1320 (Fed. Cir. 2001) ......................................................................................21

*Lyda v. CBS Corp.*,
 838 F.3d 1331 (Fed. Cir. 2016) ......................................................................................25

*Radar Indus., Inc. v. Cleveland Die & Mfg. Co.*,
424 F. App'x 931 (Fed. Cir. 2011) ...................................................24

*Recentive Analytics, Inc. v. Fox Corp.*,
134 F.4th 1205 (Fed. Cir. 2025) .......................................................2

*Sanderling Mgmt. Ltd. v. Snap, Inc.*,
65 F.4th 698 (Fed. Cir. 2023) .........................................................19

*SAP Am., Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018)........................................................3

*Simio, LLC v. FlexSim Software Prods., Inc.*,
983 F.3d 1353 (Fed. Cir. 2020).......................................................3

*Synopsys, Inc. v. Mentor Graphics Corp.*,
839 F.3d 1138 (Fed. Cir. 2016).......................................................19

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020).......................................................3

*In re TLI Commc'ns LLC Patent Litig.*,
823 F.3d 607 (Fed. Cir. 2016) ...................................................10, 11

*Trinity Info Media, LLC v. Covalent, Inc.*,
72 F.4th 1355 (Fed. Cir. 2023) .......................................................7

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
874 F.3d 1329 (Fed. Cir. 2017).........................................3, 6, 8, 15

*VDPP, LLC v. Volkswagen Group of Am., Inc.*,
2024 WL 3378456 (S.D. Tex. July 11, 2024)...................................22

*Versata Software, Inc. v. NetBrain Techs., Inc.*,
2015 WL 5768938 (D. Del. Sept. 30, 2015) ...................................11

*Voip-Pal.com, Inc. v. Apple Inc.*,
411 F. Supp. 3d 926 (N.D. Cal. 2019) ...........................................15

*Weisner v. Google LLC*,
51 F.4th 1073 (Fed. Cir. 2022) .............................................8, 12, 16

*WirelessWerx IP LLC v. OnStar, LLC*,
2024 WL 1607018 (E.D. Mich. Apr. 12, 2024)................................24

*Yu v. Apple Inc.*,
1 F.4th 1040 (Fed. Cir. 2021) .........................................................7

**Statutes**

35 U.S.C. § 101 ................................................................................................ *passim*

35 U.S.C. § 287 ...........................................................................................2, 21, 22, 23

**Other Authorities**

Fed. R. Civ. P. 8 ............................................................................................................24

Fed. R. Civ. P. 11 ..........................................................................................................23

Fed. R. Civ. P. 12(b)(6) ........................................................................................ *passim*

All emphasis is added unless otherwise noted.

## I.     INTRODUCTION

Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively, "IV") are non-practicing entities that acquire patents and monetize them through licensing and litigation. IV does not make products, offer services, or develop technology. Instead, it asserts patents—often in sweeping campaigns targeting commonplace software and computing functionalities—against companies across industries including technology, finance, telecommunications, retail, and most recently, airlines. IV has been a plaintiff in well over 100 patent cases.

IV's Amended Complaint (Dkt. 97) fails to state a claim under Rule 12(b)(6) and should be dismissed for three independent reasons.

***First***, **IV asserts numerous old, broadly worded software patents claiming abstract ideas implemented on generic hardware that are invalid under 35 U.S.C. § 101.** Since *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014), courts apply a rigorous two-step framework to scrutinize patents claiming abstract ideas, frequently resulting in invalidation at the motion to dismiss stage. The § 101 arguments presented in this motion focus on five patents that issued pre-*Alice*:

- The '582 Patent claims the abstract idea of first-come, first-served task scheduling;

- The '844 and '282 Patents claim the abstract concept of organizing and storing different categories of data in different locations in a "root-leaf" structure;

- The '722 Patent claims routing update messages to registered clients; and

- The '080 Patent claims divide-and-conquer parallel computing.

Critically, none of these patents disclose a technological improvement to computer functionality; they merely apply abstract ideas on or using general-purpose computers. Under *Alice* and its progeny, Counts I, II, V, VI, and VIII should be dismissed.

1

**Second**, IV improperly seeks pre-suit damages without plausibly alleging compliance with the marking statute, 35 U.S.C. § 287. To recover past damages, IV must allege that it and its licensees marked products practicing the patents. Despite Southwest raising this issue in earlier motions, the Complaint remains silent on whether any marking occurred—even though IV's infringement theories accuse unmarked software and systems supplied by IV's licensees. Without plausible allegations of marking, IV's claims for pre-suit damages must be dismissed.

**Third**, the Complaint fails to identify any specific Southwest product or service that infringes. IV alleges that "any Southwest system or service" using third-party tools like Docker, Kafka, Spark, and Hadoop infringes, while simultaneously acknowledging that many providers and upstream suppliers are *already licensed*. By disregarding those licenses, IV fails to allege any unlicensed or unauthorized use. These vague allegations do not provide fair notice under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009).

For these reasons, the Court should dismiss IV's Complaint under Rule 12(b)(6).

## II.     ARGUMENTS

### A. Five of the Asserted Patents Are Invalid Under 35 U.S.C. § 101 and *Alice* Because They Are Software Patents Claiming Abstract Ideas Implemented on Generic Hardware.

The Supreme Court has long held that "laws of nature, natural phenomena, and abstract ideas are not patentable" under 35 U.S.C. § 101. *Alice*, 573 U.S. at 216. These are "basic tools of scientific and technological work" and "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." *Id.* In *Alice*, the Supreme Court articulated a two-step framework that governs the patent-eligibility analysis.

At *Alice* step one, courts ask whether the claims are "directed to" a patent-ineligible concept, such as an abstract idea. *Id.* at 217. This inquiry "look[s] at the focus of the claimed advance over the prior art" and the claim's "character as a whole." *Recentive Analytics, Inc. v. Fox Corp.*, 134

F.4th 1205, 1211–12 (Fed. Cir. 2025). In the software context, the inquiry "often turns on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies an abstract idea for which computers are invoked merely as a tool." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed. Cir. 2020). Claims that merely describe an "effect or result dissociated from any method by which [it] is accomplished" are generally "not directed to patent-eligible subject matter." *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1244 (Fed. Cir. 2016) (quoting *Internet Pats. Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015)). Likewise, claims using "result-based functional language" that "does not sufficiently describe how to achieve these results in a non-abstract way" are ineligible. *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017).

If the claims are directed to an abstract idea at step one, courts proceed to *Alice* step two. Step two asks whether the claims contain an "inventive concept"—something "significantly more" than the abstract idea itself. *Alice*, 573 U.S. at 217–18. This requires "more than simply stat[ing] the abstract idea while adding the words 'apply it.'" *Id.* at 221. The abstract idea itself "cannot supply the inventive concept." *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1364 (Fed. Cir. 2020). Nor does reciting generic computer components transform an abstract idea into a patent-eligible machine. *Alice*, 573 U.S. at 223–24.

Patent eligibility under § 101 is a question of law that may be resolved on a Rule 12(b)(6) motion, and dismissal is particularly appropriate where the patents themselves describe the claimed techniques as "well-understood, routine, and conventional." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018); *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018); *see also Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).

1.  **U.S. Patent No. 7,257,582 Claims First-Come/First-Serve Processing—A Longstanding Queuing Technique That Predates Computers.**

The '582 Patent in Count V, titled *Method for Managing Distributed Processing of Tasks in a Network*, addresses dividing large input files into subtasks executed across distributed processors. The claimed method partitions an input file, distributes all partitions to each processor, executes subtasks in parallel, and repeats the processing on a "first-come/first-served" basis rather than using precomputed load-balancing. *See* '582 Patent at 1:6–20, 3:35–47.

Claim 1, charted as representative, recites in relevant part:

1.      A method of effecting on a preexisting input file a computer-executable process comprised of a plurality of subtasks, the method comprising the steps of:

(a) automatically determining file allocation and logically subdividing records of said input file into a plurality of partitions;

(b) distributing descriptions of all of said partitions to … processors;

(c) **simultaneously executing … subtasks** in each of at least some of said processors on a respective partition …;

(d) thereafter **repeating step (c)** in at least some of the subtask processors each with another unprocessed partition *on a first-come/first-served basis*; and

(e) generating at least one output combining all of the subtask outputs and reflecting the processing of all of said subtasks.

The specification concedes that most steps were conventional in distributed computing. Partitioning relied on known techniques such as byte ranges or track addresses; distributing used standard control files; processors performed routine read-process-write operations; and aggregation was a familiar merging step. *See* '582 Patent at 3:35–47, 3:67–4:15, 4:59–63.

During prosecution, the applicant admitted that the only purported advance was step (d)—the use of first-come/first-served scheduling. *See* Ex. A-3 (Appx. 33). The patentee analogized the invention to a four-way stop: unlike prior art "traffic lights" that precompute when each driver may proceed, the claimed system allows processors to take tasks as they become available. The patentee described this feature as the "primary difference" over the art.

4

That admission highlights the patent's ineligibility under § 101. First, it defines the "focus of the claimed advance over the prior art," which is the touchstone for *Alice* step one. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257–58 (Fed. Cir. 2016). Second, by comparing the invention to a traffic pattern, the patentee confirmed that the claims merely implement a conventional human method of queue management on a computer.

The claims do not recite any technological improvement to processors, memory, or distributed systems. Instead, they describe desired results—partitioning, distributing, processing, scheduling, and aggregating—in purely functional terms. The '582 Patent therefore claims nothing more than an abstract scheduling concept executed on generic hardware.

### a.   Claim 1 Is Directed to an Abstract Queue Management Technique.

At *Alice* step 1, courts examine the claims in view of their language, the specification, and, if relevant, the prosecution history. *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372, 1374 (Fed. Cir. 2020). The focus is on the "claimed advance over the prior art." *Affinity Labs*, 838 F.3d at 1257. To be patent eligible, the claims must improve "the functionality of the computer or network platform itself." *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1364 (Fed. Cir. 2020). Simply invoking a computer as a tool to implement an abstract idea is not sufficient. *See BSG Tech. L.L.C. v. Buyseasons, Inc.*, 899 F.3d 1281, 1287–88 (Fed. Cir. 2018).

Claim 1 of the '582 Patent is directed to the abstract idea of dividing a large task into subtasks and assigning them for processing on a first-come/first-served basis. This is a fundamental organizational principle: break a job into smaller tasks, assign them to workers, and have workers request new tasks when finished. Human beings have managed work in this manner for centuries. Claims rooted in such organizational practices are abstract. *See Intell. Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015).

The Federal Circuit has explained that there is a "critical difference between patenting a particular concrete solution to a problem and attempting to patent the abstract idea of a solution to the problem in general." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016). Claim 1 falls into the latter category. It does not improve computer technology or solve a specific technical problem; it merely applies a commonsense workload-management practice to distributed computing. The specification itself acknowledges that partitioning data, distributing tasks, executing in parallel, and aggregating results were all well-known operations. *See* '582 Patent at 3:35–4:15, 4:59–63.

The supposed "advance"—first-come/first-served scheduling—only underscores the abstractness. In prosecution, the applicant described the invention as akin to traffic at a four-way stop, contrasting it with a traffic light. That analogy confirms that the invention is nothing more than a human method of queue management, applied to computers. The claim recites this concept at a high level of generality, using functional language such as "logically subdividing," "distributing," and "aggregating," without describing how those steps are to be implemented. This is precisely the type of results-oriented drafting the Federal Circuit has found abstract. *See Two-Way Media*, 874 F.3d at 1337–38. Claims that describe "a result, not a means to achieve it" are abstract. *Bot M8 LLC v. Sony Corp.*, 4 F.4th 1342, 1350 (Fed. Cir. 2021).

Claim 1 does not recite any unconventional techniques for partitioning data, distributing subtasks, or aggregating results. *See* '582 Patent at 3:35–4:15, 4:59–63. It claims only the outcome of applying a familiar queue-management concept to computers. As *Elec. Power Grp.* makes clear, claims directed to results of data processing without concrete means for achieving them are abstract and invalid. 830 F.3d at 1356. Because Claim 1 is directed to nothing more than a longstanding method of organizing tasks, it is ineligible under *Alice* step one.

### b.  Claim 1 Lacks an Inventive Concept and Claims Only First-Come/First Served Processing on Generic Hardware.

To transform an abstract idea into patent-eligible subject matter, a claim must include an "inventive concept"—something "significantly more" than the abstract idea itself. *Alice*, 573 U.S. at 217–18. Well-understood, routine, and conventional techniques do not qualify. *BSG Tech.*, 899 F.3d at 1290–91. Nor does computer implementation of an abstract idea supply an inventive concept if "carried out in existing computers long in use." *Alice*, 573 U.S. at 222.

Claim 1 of the '582 Patent recites only conventional steps and generic components. The elements—partitioning input data, distributing tasks to processors, executing subtasks in parallel, and aggregating results—were all well-known techniques for workload distribution, as the specification itself concedes. *See* '582 Patent at 3:35–4:15, 4:59–63.

The supposed point of novelty—first-come/first-served scheduling—is likewise routine. As the applicant admitted, it is no different from managing cars at a four-way stop. Far from a technical innovation, it merely applies a basic human queue-management principle to computer processing. Such claims "merely appl[y] well-known idea[s] using generic computers." *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1314 (Fed. Cir. 2016). The specification does not identify any unique adaptation of this scheduling technique to distributed computing. It simply applies this known concept predictably to allocate unprocessed subtasks. Thus, claim 1 is "directed to a result or effect that itself is the abstract idea and merely invoke[s] generic processes and machinery" rather than "a specific means or method that improves the relevant technology." *Yu v. Apple Inc.*, 1 F.4th 1040, 1043 (Fed. Cir. 2021).

Confirming the lack of inventiveness, the patent relies entirely on generic computing components such as processors, memory, and network architecture. *See* '582 Patent at 4:27–36. The Federal Circuit has made clear that reciting these components without novel configurations or

functionalities does not add an inventive concept. *See Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1364, 1366–67 (Fed. Cir. 2023). The claim's functional language—"automatically determining," "logically subdividing," "distributing," "executing," and "combining"—describes desired results at a high level of abstraction, without concrete mechanisms. The specification's own admissions confirm the use of existing technology, which courts may rely on to conclude a lack of inventive concept. *Weisner v. Google LLC*, 51 F.4th 1073, 1083 (Fed. Cir. 2022). This is the type of result-oriented claiming the Federal Circuit has repeatedly rejected. *See Two-Way Media*, 874 F.3d at 1337–38; *Elec. Power Grp.*, 830 F.3d at 1356.

Because Claim 1 offers nothing beyond an abstract scheduling idea, it fails to supply an inventive concept under *Alice* step 2. Count V should therefore be dismissed.

### 2.  U.S. Patent Nos. 8,332,844 and 7,721,282 Claim Root-Leaf Storage for Organizing and Storing Information—A Fundamental Information-Organization Paradigm.

The '844 and '282 Patents in Counts I and VIII share a common specification lineage and focus on the concept of distributed application environments. The '282 Patent, titled *Block-Level I/O Subsystem for Distributed Computing Environment Management*, was filed first and describes a system in which read-only "root images" are merged with per-node "leaf images" using a "union block device" to deploy computing environments across multiple nodes. The '844 Patent, titled *Root Image Caching and Indexing for Block-Level Distributed Application Management*, is a continuation-in-part of the '282 Patent and extends the shared specification by introducing caching and indexing mechanisms to optimize the deployment of distributed environments.

Both patents depend on underlying techniques that were admittedly well-understood, routine, and conventional practices at the time of filing. For example, clustered computing and distributed file systems were established technologies. *See* '282 Patent at 1:21–35; '844 Patent at 1:31–45. Root-leaf storage methods were commonly used to create boot images "on the fly." *See* '282 Patent

at 1:62–2:6; '844 Patent at 2:14–25. And caching mechanisms, including least-recently-used ("LRU") algorithms, were known in the art. *See* '844 Patent at 6:38–7:17.

The '282 Patent claims a system for organizing and storing information, with claim 1 charted as representative for Count VIII (Dkt. 97-15). Claim 1 recites, in relevant part:

> 1. A system for distributing an application environment comprising:
>
> a compute node comprising a computer system;
>
> a first storage unit for storing blocks of **a root image** …;
>
> a second storage unit for storing **a leaf image** …; and
>
> a union block device for interfacing between the compute node and the first and second storage units … wherein **the union block device creates the application environment by merging** the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit ….

The '844 Patent claims methods for organizing and storing information, with claim 7 charted as representative for Count I (Dkt. 97-7). Claim 7 recites, in relevant part:

> 7. A method for providing data to a plurality of compute nodes, comprising:
>
> storing blocks of **a root image** of said compute nodes on a first storage unit;
>
> storing **leaf images** for respective compute nodes on respective second storage units…; and
>
> **caching blocks of said root image** that have been accessed by at least one of said compute nodes in a cache memory.

Both patents rely on general computer hardware and software, as shown in Figure 1 of each patent, which depicts general-purpose computing devices with standard storage media. *See* '282 Patent at 4:11–40; '844 Patent at 4:27–56. Components such as "Union Block Devices" ("UBDs") are described merely as low-level drivers without any disclosed novel functionality. *See* '282 Patent at 4:41–45; '844 Patent at 5:19–64. The claims are drafted in broad functional language— "providing," "distributing," "storing," "interfacing," and "caching"—without specifying any improved algorithms, hardware, or software. In sum, the claims reflect the conventional practice

of storing one type of data (a "root image") in a first location, storing another type of data (a "leaf image") in a second location, and using standard hardware and techniques to merge or cache data.

The prosecution history of the '282 Patent underscores the abstract nature of the claims. On July 8, 2009, the examiner rejected original claims 1–33 under § 101, explaining the system was "an abstract idea" that failed to disclose how it would "process and carry out its intended results." *See* Ex. A-1 (Appx. 9–10). The applicant overcame the rejection by amending the claims to recite generic hardware components, such as the "first storage unit," "second storage unit," and "memory." Ex. A-2 (Appx. 28, 30). While the amendments satisfied the examiner's objection at the time, modern § 101 precedent makes clear that merely adding conventional hardware does not transform an abstract idea into a patent-eligible invention. *See, e.g., Alice*, 573 U.S. at 223–24.

### a. Claims 1 and 7 Are Directed to Organizing and Storing Information.

Claim 1 of the '282 Patent and claim 7 of the '844 Patent both recite the abstract concept of organizing and storing information in a root-leaf structure: keeping a master "root image" shared across compute nodes, maintaining individualized "leaf images" for per-node changes, and (for the '844 Patent) caching frequently accessed blocks. These steps mirror basic data collection and organization practices analogous to longstanding human conduct—*e.g.*, keeping a central record and local edits—without any technical innovation. *See Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1327 (Fed. Cir. 2017) (organizing information is an abstract idea); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) ("*TLI*") (claim related to creating and storing data images based on "classification" of the data); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("The concept of data collection, recognition, and storage is undisputedly well-known.").

Claim 1 recites broad steps—storing root and leaf images and merging them using a generic "union block device"—without any new algorithm, circuit, or file structure. *See* '282 Patent at

claim 1; *see also ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019) (claims using functional language to describe results without specific technological means are abstract). The recitation of concrete components like "first storage unit," "second storage unit," and "union block device" does not avoid abstraction. *TLI*, 823 F.3d at 611. The patents themselves concede cluster computing and distributed file systems were established technologies; root-leaf boot images were common; and caching algorithms like LRU were routine. *See* '282 Patent at 1:21–35, 1:62–2:6; '844 Patent at 1:31–45, 2:14–25, 6:38–7:17.

Claim 7 of the '844 Patent merely adds the step of caching blocks already accessed—another routine function the specification admits was standard. *See* '844 Patent at 6:38–7:17; *Erie Indem.*, 850 F.3d at 1327 ("organizing and accessing [data] . . . includes longstanding conduct that existed well before the advent of computers"). Simply storing data in a hierarchy, caching it, or recognizing and organizing information are classic examples of abstract ideas. *See Content Extraction*, 776 F.3d at 1347; *Versata Software, Inc. v. NetBrain Techs., Inc.*, 2015 WL 5768938, at *7 (D. Del. Sept. 30, 2015) ("representing information in a hierarchy amounts to an abstract idea").

In the end, the claims resemble a traditional library system where the central card catalog serves as a shared, primary record (root); individual checkout cards track each book's borrower and status (leaf); and the return cart holds recently returned books awaiting reshelving (cache). These practices are longstanding techniques for organizing and storing information, not technological solutions. Because the claims do not specify any concrete technical advancement beyond these conventional organizational methods, they are directed to an abstract idea and fail *Alice* step 1.

**b. Claims 1 and 7 Lack an Inventive Concept and Merely Claim the Use of Generic Hardware to Organize and Store Information.**

Claims 1 and 7 also fail *Alice* step 2 because they do not recite any "inventive concept" that could transform the abstract idea of organizing and storing information into a patent-eligible

application. *See Alice*, 573 U.S. at 217–18. Instead, the claims apply the abstract root-leaf storage idea using generic, conventional computing components.

Courts may rely on the specifications' own admissions to conclude claims use existing technology. *Weisner*, 51 F.4th at 1083. The patents themselves concede that the claimed techniques—storing root images, maintaining leaf images for local changes, and caching frequently accessed blocks—were conventional practices at the time of filing. *See* '282 Patent at 1:21–35, 1:62–2:6 (cluster computing, distributed file systems, root-leaf boot images); '844 Patent at 1:31–45, 2:14–25, 6:38–7:17 (caching). These admissions confirm that the claims use generic hardware and software without any new algorithms, configurations, or improvements. *Symantec*, 838 F.3d at 1315 ("claims use generic computers to perform generic computer functions").

The claims themselves underscore their conventional nature, reciting only high-level functional steps—"providing," "distributing," "storing," "interfacing," and "caching"—without specifying any inventive implementation for these tasks. *See BSG Tech.*, 899 F.3d at 1290–91 ("If a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea"). Components like the "union block device" are described in the specification as low-level drivers performing routine merging of data blocks, not any technological advance. *See* '282 Patent at 4:41–45; '844 Patent at 5:19–64.

Courts have invalidated similar claims applying conventional computing elements to abstract goals. *See, e.g.*, *Content Extraction*, 776 F.3d at 1348. Claims 1 and 7 fall squarely in this category, merely combining conventional elements to perform abstract data organization and caching without any innovative improvement.

The prosecution history of the '282 Patent reinforces the absence of a non-abstract inventive concept. The examiner initially rejected the claims as abstract, and the applicant overcame that rejection solely by adding generic hardware references, such as "first storage unit," "second storage unit," and "union block device." *See* Ex. A-1 (Appx. 9–10); Ex. A-2 (Appx. 28, 30). But under modern § 101 precedent, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 223–24. The claims merely require storing one type of data (a "root image") in one place, another type of data (a "leaf image") in a second place, and using standard techniques to merge or cache data. Because claims 1 and 7 fail both steps of the *Alice* inquiry, Counts I and VIII should be dismissed.

### 3. U.S. Patent No. 8,407,722 Claims Transferring Information Through Digital Networks to Registered Clients—A Longstanding Subscription-and-Delivery Practice.

The '722 Patent in Count II, titled *Asynchronous Messaging Using a Node Specialization Architecture in the Dynamic Routing Network*, "pertains in general to transferring information through digital networks." '722 Patent at 1:24–26. It describes a method for delivering webpage content updates to registered recipients; instead of requiring users to manually refresh a webpage to see updated stock prices or sports scores, the system maintains registration data and routes update messages to registered client devices when information changes. *Id.* at 2:29–44, 3:9–20.

Sending updated information to registered clients is a longstanding human activity that is inherently abstract. And the patent relies entirely on conventional technology. All components— servers, information providers, dynamic content providers, and client devices—are "preferably a conventional computer system" or a "conventional personal computer." *Id.* at 6:13–24, 9:53–55, 10:14–17. They communicate over "conventional communications links" using "standard Internet communications protocols." *Id.* at 4:66–5:2, 11:58–61. The routing network uses conventional single-processor systems, hash tables to store registrations, and message-delivery techniques

"known in the art." *Id.* at 16:14–16, 17:1–9. The specification further admits that "those skilled in the art will recognize that there are many ways" to route update messages. *Id.* at 16:28–46.

Claim 14 is charted as representative. It recites "*providing* … a data representation to a client device [that] includes at least one live object"; "*causing* the client device … to register for updates"; and "*sending* … an update message to the routing network." The claim then recites a two-step routing process: first, "a gateway device" is "configured to *identify* a category of the update message based on the input source," "*determine* a node type" mapped to that category, and "*route* the update message to the node"; second, a "node" is "configured to *identify* the client device as a registered device and to *route* the update message to the client device." These steps are assigned to generic components—"processing device," "routing network," "gateway device," "node," and "client device"—without reciting any specific protocol, algorithm, data structure, or technical means for categorization, mapping, or message routing.

The prosecution history confirms the abstract, software-based nature of the claims. In July 2009, the examiner rejected the claims as "software, per se," explaining that they failed to "define the structural and functional interrelationships between the claimed apparatus and constituent elements thereof." Ex. A-4 (Appx. 46–48). The applicant overcame this rejection solely by adding the phrase "using a processing device"—generic hardware language—without asserting any improvement to computer or network functionality. Ex. A-5 (Appx. 62–66). This pre-*Alice* approach of reciting generic hardware does not suffice to make a claim patent eligible today.

a. **Claim 14 Is Directed to the Abstract Idea of Subscription-Based Content Distribution to Registered Recipients.**

Claim 14 is directed to the abstract idea of subscription-based content distribution to registered recipients when new information becomes available. This organizational concept long predates computers. Before digital networks, publishers maintained subscription records, received updated

14

content from various sources, and routed that content through distribution channels to subscribers based on both the source of the content and the subscribers' registrations. While computers allow this process to occur faster and at scale, improving the speed or efficiency of a longstanding information practice does not convert it into a technological improvement.

The Federal Circuit has repeatedly held that claims directed to collecting, categorizing, and distributing information are abstract. *See Capital One Bank*, 792 F.3d at 1367–70; *Elec. Power Grp.*, 830 F.3d at 1353–56; *Content Extraction*, 776 F.3d at 1347. District courts applying this precedent have invalidated structurally similar network-routing claims where the asserted advance lay in organizing and directing information rather than improving network technology. *See Voip-Pal.com, Inc. v. Apple Inc.*, 411 F. Supp. 3d 926, 953–58 (N.D. Cal. 2019).

Claim 14 fits squarely within this line of cases. It describes an information-distribution scheme in which update messages are first classified based on their source and then routed to recipients based on stored registration data. The claim does not disclose how categories are defined, how input sources are mapped to categories, how categories map to node types, or how any of those determinations improve network operation. Treating messages differently depending on their source is itself an abstract information-organizing rule, not a technological innovation. Allocating that rule across generic network components—gateways, nodes, and clients—does not convert the abstract scheme into a technological improvement. *See Elec. Power Grp.*, 830 F.3d at 1353–56; *Voip-Pal.com*, 411 F. Supp. 3d at 953–58.

The claim's result-oriented functional language reinforces its abstract nature. The gateway is "configured to identify" a category, "determine" a node type, and "route" a message; the node is "configured to identify" registered clients and "route" the update to them. No algorithm for source-based categorization is disclosed. No structure for category-to-node-type mapping is provided. No

technical constraint on routing behavior is specified. By claiming every possible way of classifying messages by source and routing them to registered recipients, the claim's breadth confirms it is directed to the result of information distribution itself, not to any particular technological means of achieving it. *See Two-Way Media*, 874 F.3d at 1337–38. Claim 14 is "result-oriented, describing required functions ... without explaining how to accomplish any of the tasks." *Int'l Bus. Machines Corp. v. Zillow Group, Inc.*, 50 F.4th 1371, 1378 (Fed. Cir. 2022).

The patent's own characterization confirms this conclusion. The specification emphasizes that categorization and routing may be implemented in "many ways" already known in the art. '722 Patent at 16:28–46. Where a patent describes its claimed approach as one of several well-understood options, it confirms the claim seeks a desired informational result rather than a specific technological solution. *See Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1345 (Fed. Cir. 2018). Because Claim 14 is directed to the abstract concept of subscription-based content distribution implemented on generic network components, it fails *Alice* step one.

### b. Claim 14 Lacks an Inventive Concept and Only Claims Delivering Updated Content to Registered Clients Using Generic Hardware.

Claim 14 also fails *Alice* step two because it recites only generic computer components performing conventional networking functions. The specification confirms that all elements were routine: "conventional computer systems," "conventional communications links," "standard Internet communications protocols," hash tables for storing registrations, and message-delivery techniques "known in the art." '722 Patent at 4:66–5:2, 6:13–15, 6:23–24, 9:53–55, 10:14–17, 11:58–61, 16:14–16, 17:1–9. The Court may rely on these admissions in the specification to confirm the lack of inventive concept. *Weisner*, 51 F.4th at 1083.

Nothing about the claimed combination is *purportedly* unconventional. Using intermediary network components to classify messages by source, consult stored registration data, and forward

messages was routine networking functionality. *Id.* at 16:28–46. The combination of generic components performing generic functions does not supply an inventive concept. *See BSG Tech.*, 899 F.3d at 1290; *Alice*, 573 U.S. at 221–22.

The prosecution history reinforces this conclusion. When the examiner rejected the claims for failing to define structural relationships, the applicant responded by appending generic hardware language, not by showing that the invention improves computer or network functionality. Exs. A-4, A-5. Under *Alice*, appending conventional computer components at a high level of generality cannot supply an inventive concept. 573 U.S. at 221–24. Because Claim 14 offers nothing beyond the abstract idea of subscription-based content distribution implemented on conventional network components, it is invalid under § 101. Count II should be dismissed.

### 4. U.S. Patent No. 7,712,080 Claims Distributed Parallel Computing—A Fundamental Divide-And-Conquer Technique Applied to Computing Tasks.

The '080 Patent in Count VI, titled *Systems and Methods for Parallel Distributed Programming*, relates to programming software that executes tasks in parallel (simultaneously) on multiple processors. '080 Patent at 1:25–30. The specification admits that "parallel distributed programs" were known the art, explaining that "software application[s] for operation on multiple processors that uses multiple memory areas. . . . are often referred to as 'parallel distributed programs.'" *Id.* at 1:25–28, 2:42–45 (Figures 1a and 1b show these "prior art" approaches). The patent describes the invention as taking a "distributed sequential computing" program and "transform[ing]" it into a "distributed parallel computing" program by "spawning" child programs that execute sub-tasks of a primary task concurrently with the parent. *Id.* at 6:61–65.

According to the specification, the advantage of such programs is that they execute sub-tasks in parallel rather than sequentially—like multiple movers hauling boxes into the same house at the same time—resulting in faster overall task execution. *See id.* at 1:31–52.

Claim 1 is charted as representative and instructs a developer to "develop[] a distributed parallel computing program" by (i) "establishing" a "distributed shared variable," which is a "single variable that includes several variables that may be physically distributed across multiple memories," (ii) "developing" a sequential program that can access the "distributed shared variable," and (iii) "transforming" that program from a "sequential" computing program to a "parallel" computing program by "spawning" a child program when an "intermediate condition" arises so the parent and child can execute tasks in parallel. The claim describes what a programmer should accomplish—establish a shared variable across memories, develop a sequential program, and transform it into a parallel program by spawning child processes—but says nothing about *how* to accomplish any of these steps. No algorithm is disclosed. No data structure is specified. No technical implementation is described. The patent claims the result of parallel processing—invoking functional terms like "establishing," "developing," "spawning," and "transforming"—with no supporting instruction. It relies on conventional hardware and functions to implement an abstract parallel task execution paradigm. Claim 1 is invalid under *Alice*.

### a.  Claim 1 Is Directed to the Abstract Idea of Distributed Parallel Computing.

Claim 1 is directed to the abstract idea of dividing and conquering computing tasks. The claim recites three steps: (1) establishing a shared variable; (2) developing a sequential program that accesses it; and (3) transforming that program into a parallel program by spawning child processes when certain conditions arise so that the "parent" and "child" programs can complete tasks in parallel. This is nothing more than "divide-and-conquer" applied to computer programming.

Divide-and-conquer strategies are ubiquitous in human activity. A head chef coordinates sous chefs to prepare different components of a meal simultaneously. A general contractor assigns specialized crews—carpenters, electricians, plumbers, and painters—to work on different aspects of a building in parallel. A project manager distributes tasks among team members, spawning new

workstreams when intermediate milestones are reached. Claim 1 captures this same organizational principle, merely applying it to processing data.

Because parallel computing is conceptually the same as the divide-and-conquer concept, courts have held claims directed to distributing computing tasks among parallel processors to be abstract ideas under *Alice*. In *Appistry, Inc. v. Amazon.com, Inc.*, the court invalidated claims directed to a system that used "a hive of computing machines . . . to process information" by distributing tasks through a hierarchical structure of "request handlers," "process handlers," and "task handlers." 195 F. Supp. 3d 1176, 1178–79 (W.D. Wash. 2016). The court characterized these claims as directed to "the abstract idea of distributed processing akin to the military's command and control system," where a commanding officer delegates tasks to subordinates who execute them in parallel. *Id.* at 1179. As the court explained, the claims "simply provide for completing a task or process by distributing it downward via a hierarchical series of 'handlers' located on generic computers spread throughout a generic network. There is nothing inventive about that." *Id.* at 1182.

Similarly, in *Swarm Tech. LLC v. Amazon.com, Inc.*, the court found claims directed to a "processing architecture" where "autonomous co-processors ... proactively retrieve tasks from a task pool populated by a central processing unit" were abstract. 561 F. Supp. 3d 861, 863–64 (D. Ariz. 2021). The court analogized the claims to a project manager's "scrum board"—a system where tasks are written on sticky notes, posted on a board, collected by team members, completed, and then moved to the "complete" side. *Id.* at 866. Although the patentee argued that its invention provided "the speed of parallel processing" and improved computer performance, the court held that simply "claiming the improved speed or efficiency inherent with applying the abstract idea on a computer [does not] provide a sufficient inventive concept." *Id.* at 867; *see also Sanderling*

*Mgmt. Ltd. v. Snap, Inc.*, 65 F.4th 698, 703 (Fed. Cir. 2023) (claims directed to distributing functions based on conditions were abstract).

The same reasoning applies here. Like the patents in *Appistry* and *Swarm Tech*, the '080 Patent claims the abstract concept of distributing tasks across programs for parallel execution—establishing shared variables, developing programs, and spawning child programs—without specifying any technological means that would distinguish it from these invalidated claims.

Even if distributed parallel computing represented a significant new concept in computer science, "a claim for a new abstract idea is still an abstract idea." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016). The question under *Alice* is not whether the concept is useful or innovative, but whether it improves computer technology or merely uses computers as a tool to implement an abstract organizational principle.

Because Claim 1 is directed to the abstract idea of dividing and conquering a primary task applied to computer programming, it fails at *Alice* step one.

### b. Claim 1 Lacks an Inventive Concept That Goes Beyond Applying the Divide-and-Conquer Strategy on Generic Hardware.

Claim 1 fails at *Alice* step 2 because it adds nothing to the abstract concept beyond instructing practitioners to apply it using entirely conventional computing components and software functions. The specification concedes that "parallel distributed programs" were known in the art, explaining that "software application[s] for operation on multiple processors that uses multiple memory areas. . . . are often referred to as 'parallel distributed programs.'" '080 Patent at 1:25–28, 2:42–45 (describing Figure 1a and 1b as illustrations of these "prior art" approaches). Claim 1 does not recite any unique hardware components, illustrating that its claimed method may be implemented using any array of conventional computer hardware components. Thus, the '080 Patent recites

nothing more than a well-understood, routine, and conventional activity previously known in the industry using generic computing components.

The claim's functional language underscores its lack of inventive content. Claim 1's functional language—"establishing," "developing," "transforming," "spawning," "performing parallel processing"—describes desired results without explaining *how* to achieve them. The Federal Circuit has consistently emphasized that there is an "important common-sense distinction between ends sought and particular means of achieving them, between desired results (functions) and particular ways of achieving (performing) them." *Elec. Power Grp.*, 830 F.3d at 1356. Claim 1 falls into the former category. It does not describe how to "transform[] the at least one distributed sequential computing program into at least one distributed parallel computing program" or how to "spawn[] at least one child distributed sequential computing program from the at least one distributed sequential computing program"—it merely claims the result of doing so. Such results-oriented drafting is abstract. *See ChargePoint*, 920 F.3d at 769 ("Even a specification full of technical details" may conclude with claims directed to an "abstract idea.").

Because Claim 1 of the '080 Patent offers nothing beyond an abstract and well-known divide-and-conquer strategy implemented using conventional computer and software components, it fails to supply an inventive concept under *Alice* step 2. Count VI should therefore be dismissed.

## B. Pre-suit Damages Are Not Available Because IV Has Not Pleaded Compliance With the Marking Statute, 35 U.S.C. § 287.

To recover damages for alleged infringement occurring before the filing of a complaint, a patentee must comply with the patent marking statute, 35 U.S.C. § 287(a). "The patentee bears the burden of pleading and proving he complied with § 287." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017) ("*Arctic Cat I*"). This burden extends to licensees—a patentee must plead that it "made reasonable efforts to ensure compliance

with the marking requirements" by its licensees. *Id.* When a patentee does not sufficiently plead compliance, courts may dismiss claims for pre-suit damages under Rule 12(b)(6). *See, e.g., Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1328–29 (Fed. Cir. 2001); *e-Watch Inc. v. Avigilon Corp.*, 2013 WL 5231521, at *3 (S.D. Tex. Sept. 13, 2013).

The procedural history underscores the deficiency. IV first notified Southwest of alleged infringement of the '844, '722, '326, '469, and '582 Patents on November 1, 2024, with the filing of the original complaint. Dkts. 1, 1-7. It did not provide notice of the '080, '000, and '282 Patents until May 23, 2025, when it moved for leave to file its amended complaint. Dkt. 37. In its original and first amended complaints, IV did not attempt to plead compliance with § 287 at all. Only after Southwest moved to dismiss did IV add marking allegations in its Second Amended Complaint. Dkt. 64 ¶¶ 224–227. Those allegations remain substantially unchanged in IV's operative Amended Complaint for Patent Infringement. Dkt. 97 ¶¶ 168–171.

IV's marking allegations are both evasive and insufficient. In its Amended Complaint for Patent Infringement, IV still does not allege that (i) the asserted patents were continuously marked throughout the relevant period, including by prior owners; (ii) settling defendants and other licensees were required to mark products practicing the asserted claims; or (iii) IV undertook any effort to ensure marking compliance.[1] Instead, IV asserts only that it sells no products of its own, that some patents may contain only method claims, and that certain litigation licensees denied infringement. *See* Dkt. 97 ¶¶ 168–171. None of these points is controlling or sufficient to satisfy

---

[1] IV does not allege facts showing full compliance with the marking statute by prior patentees and licensees. *See Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 950 F.3d 860, 864 (Fed. Cir. 2020) ("*Arctic Cat II*"). IV has sued and "settled" with defendants that "continued to sell the patented products," yet IV offers no facts showing "that these entities marked the accused products." *See VDPP, LLC v. Volkswagen Group of Am., Inc.*, 2024 WL 3378456, at *1 (S.D. Tex. July 11, 2024). IV concedes that it does "not contractually require its licensees to mark." *Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*, 906 F. Supp. 2d 399, 411 (W.D. Pa. 2012).

IV's statutory burden, especially for the counts relating to the '326, '469, '282, and '000 Patents where system claims are expressly asserted in the Amended Complaint.

IV's own infringement theories underscore the defect. It charts the asserted patents against Spark and Hadoop systems supplied to Southwest by IV's own licensee, AWS, without patent markings. *See, e.g.*, Dkt. 97-7. By IV's own theory, those licensees are distributing practicing products without patent markings. The same is true of the two aircraft Wi-Fi patents. IV accuses Southwest's systems supplied by Anuvu and Viasat, incorporating components from settling litigation defendants—Extreme Networks and Aruba/HPE. IV makes no allegation that those components were marked or that IV took any steps to ensure compliance, despite accusing those systems of infringement.

IV's marking allegations serve only to cloud and obscure the marking issue rather than clarify and resolve it. IV has not pleaded—nor could it consistently with Rule 11—that it, its predecessors, and its licensees fully complied with § 287 throughout the relevant period. Having failed to plausibly allege compliance, IV cannot sustain its claim for pre-suit damages, and that portion of its pleading should be dismissed.

## C. The Complaint Fails to Plead Any Unlicensed Infringing Use of the Accused Technologies.

A complaint must "place the alleged infringer 'on notice of what activity … is being accused of infringement.'" *Bot M8*, 4 F.4th at 1352. "There must be some allegation of specific services or products of the [accused infringer] which are being accused." *Addiction & Detox. Inst. L.L.C. v. Carpenter*, 620 F. App'x 934, 937 (Fed. Cir. 2015).

Here, the Complaint alleges that Southwest infringes by offering "services and technologies" that use the third-party software programs Kafka, Docker, Spark, and Hadoop. *See, e.g.*, Dkt. 97 ¶ 23. It asserts that these programs practice the '844, '722, '080, '282, and '582 Patents but never

identifies any specific Southwest product, system, or service accused of infringement. Instead, it defines "Accused Products and Services" broadly as any "products, services, and technologies" Southwest "makes, utilizes, services, tests, distributes, sells, offers, and/or offers for sale in the State of Texas and the Northern District of Texas." Dkt. 97 ¶ 7.

The Complaint then compounds this ambiguity by accusing not only unspecified systems but also "all past, current, and future systems and services" that "operate in the same or substantially similar manner" or "have the same or substantially similar features." *See, e.g.*, Dkt. 97-7 at 2. It further states these are only nonlimiting examples. *E.g.*, Dkt. 97 ¶ 41. Such sweeping allegations fail to give Southwest notice of what conduct is actually accused.

Like the deficient pleadings in *Carpenter* and *WirelessWerx IP LLC v. OnStar, LLC*, 2024 WL 1607018, at *9–10 (E.D. Mich. Apr. 12, 2024), the Complaint includes "bare allegations" that Southwest infringes merely because it uses common third-party software, without identifying any Southwest-specific implementation or feature alleged to infringe. This is exactly the sort of speculative pleading insufficient under Rule 8. *See Carpenter*, 620 F. App'x at 937; *Artrip v. Ball Corp.*, 735 F. App'x 708, 714–15 (Fed. Cir. 2018) (finding conclusory allegations insufficient where complaint could encompass virtually all aspects of defendant's operations).

Moreover, the Complaint's allegations of infringement are rendered implausible by its own admissions that upstream suppliers of the accused software or cloud services are licensed under the asserted patents—yet the Complaint fails to specify which providers are licensed and which are not. *E.g.*, Dkt. 97-7 at 2 n.1. This acknowledgment makes Plaintiffs' infringement theory speculative at best because it relies on the assumption that Southwest's use somehow falls outside of licensed activity without any supporting factual allegations. "The inclusion of [the phrase 'on information and belief'] creates an inference that [Plaintiffs] likely lack[] knowledge of the

24

underlying facts to support the assertion[s], and [are] instead engaging in speculation to an undue degree." *Celgard, LLC v. Shenzhen Senior Tech. Material Co.*, 2020 WL 7392909, at *5 (W.D.N.C. Dec. 17, 2020). Because Plaintiffs admit that third-party providers of the accused technologies may be licensed, Plaintiffs' failure to identify which uses are unlicensed underscores the implausibility of their infringement claims. *See Radar Indus., Inc. v. Cleveland Die & Mfg. Co.*, 424 F. App'x 931, 933 (Fed. Cir. 2011) ("An express or implied license is a defense to infringement."); *JVC Kenwood Corp. v. Nero, Inc.*, 797 F.3d 1039, 1045 (Fed. Cir. 2015) ("without specific allegations and evidence showing use of unlicensed optical discs, Nero has established a complete defense to all of JVC's allegations of infringement under the Patents.").[2] Plaintiffs' statement that they "will provide relevant license agreements . . . in discovery" underscores that they cannot meet their burden to plausibly plead infringement before proceeding to discovery. *See Twombly*, 550 U.S. at 556, 558 ("[A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.").[3]

### III.     CONCLUSION

Southwest respectfully requests dismissal under Rule 12(b)(6) of the challenged counts discussed above for (1) patent ineligibility/invalidity under § 101 and *Alice*, (2) failing to plead compliance with the marking statute, and (3) failing to identify the alleged unlicensed infringing activities with reasonable particularity.

---

[2] Because the Complaint's enhanced damages allegations rest entirely on these implausible direct infringement claims, dismissal of the direct infringement allegations necessarily requires dismissal of Plaintiffs' claims for enhanced damages as well. *See CTD Networks, LLC v. Google, LLC,* 688 F. Supp. 3d 490, 503 (W.D. Tex. 2023).

[3] To the extent Plaintiffs attempt to allege joint infringement, *see, e.g.,* Dkt. 97 ¶ 41, the Complaint does not identify any third parties allegedly performing steps of the claimed methods or allege facts showing Southwest directed or controlled any such parties, as required to state a plausible joint infringement claim. *See Lyda v. CBS Corp.,* 838 F.3d 1331, 1338–39 (Fed. Cir. 2016).

Dated: January 5, 2026

Respectfully submitted,

*/s/ S. Wallace Dunwoody*
Michael C. Wilson
Texas Bar No. 21704590
mwilson@munckwilson.com
S. Wallace Dunwoody
Texas Bar No. 24040838
wdunwoody@munckwilson.com
Lucas R. Dombroski
Texas Bar No. 24142846
ldombroski@munckwilson.com
**Munck Wilson Mandala, LLP**
2000 McKinney Avenue, Suite 1900
Dallas, Texas 75201
(972) 628-3600
(972) 628-3616 fax

David G. Henry
Texas Bar. No. 09479355
dhenry@munckwilson.com
**Munck Wilson Mandala, LLP**
510 Austin Avenue, Suite 3100
Waco, Texas 76701
(254) 362-2300
(254) 362-2304 fax

Tri T. Truong
Texas Bar No. 24102969
ttruong@munckwilson.com
**Munck Wilson Mandala, LLP**
807 Las Cimas Parkway, Suite 300
Austin, Texas 78756
737-201-1600
737-201-1601 fax

*Attorneys for Southwest Airlines Co.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document was filed and served to all counsel of record using the Court's CMECF system on January 5, 2026.

*/s/ S. Wallace Dunwoody*
S. Wallace Dunwoody

26