**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC,<br><br>    *Plaintiffs,*<br><br>    v.<br><br>SOUTHWEST AIRLINES CO.,<br><br>    *Defendant.* | **Civil Action No. 3:25-CV-02885-L-BN (consolidated with 3:25-cv-03097-L)**<br><br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S**
**RULE 12(b)(6) MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.   BACKGROUND ............................................................................................ 1

III.  LEGAL STANDARDS ................................................................................. 2

IV.   ARGUMENT .................................................................................................. 3

    A.    Each of the '582,'844,'282, '722, and '080 Patents are Patent Eligible under § 101. ............................................................................................ 3

        1.    The '582 Patent Is Valid Under 35 U.S.C. § 101. .................................... 3

        2.    The '844 Patent and '282 Patent Are Valid Under 35 U.S.C. § 101. ......... 8

        3.    The '722 Patent Is Valid Under 35 U.S.C. § 101. .................................... 13

        4.    The '080 Patent Is Valid Under 35 U.S.C. § 101. .................................... 19

    B.    IV Is Not Precluded From Obtaining Pre-Suit Damages. .................................... 25

    C.    IV Plausibly and Sufficiently Pled Infringing Uses for the Cloud Patents. .......... 26

V.    CONCLUSION ................................................................................................ 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018).................................................................... *passim*

*AlexSam, Inc. v. Aetna, Inc.*,
   119 F.4th 27 (Fed. Cir. 2024) .............................................................................27

*Alice Corp. v. CLS Bank Int'l*,
   573 U.S. 208 (2014)........................................................................................2, 17

*Altair Logix LLC v. Netgear, Inc.*,
   No. CV 20-1004-MN-CJB, 2021 WL 6424910 (D. Del. Dec. 6, 2021)............6, 22

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
   841 F.3d 1288 (Fed. Cir. 2016)......................................................................12, 17

*Ancora Techs., Inc. v. HTC Am., Inc.*,
   908 F.3d 1343 (Fed. Cir. 2018), *as amended* (Nov. 20, 2018)..............................15

*Appistry, Inc. v. Amazon.com, Inc.*,
   195 F. Supp. 3d 1176 (W.D. Wash. 2016)...........................................................21

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*,
   876 F.3d 1350 (Fed. Cir. 2017)......................................................................25, 26

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
   827 F.3d 1341 (Fed. Cir. 2016)...........................................................................18

*Berkeley\*IEOR v. Teradata Operations, Inc.*,
   719 F. Supp 3d 842 (N.D. Ill. 2024) ...................................................................24

*Berkheimer v. HP, Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018)..................................................................... *passim*

*Celanese Int'l Corp. v. Anhui Jinhe Indus. Co., Ltd.*,
   No. 20-1775-LPS, 2021 WL 7209494 (D. Del. Dec. 10, 2021) ............................28

*Celgard, LLC v. Shenzhen Senior Technology Material Co. (US) Research Institute*,
   No. 19-cv-05784-JST, 2020 WL 7392909 (N.D. Cal. July 23, 2020)....................28

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
   776 F.3d 1343 (Fed. Cir. 2014)..............................................................7, 11, 12, 16

*Contour IP Holding LLC v. GoPro, Inc.*,
    113 F.4th 1373 (Fed. Cir. 2024) ................................................................ *passim*

*Coop. Ent. Inc. v. Kollective Tech., Inc.*,
    50 F.4th 127 (Fed. Cir. 2022) ...............................................................2, 3, 12

*CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*,
    15 F.4th 1091 (Fed. Cir. 2021) ...........................................................7, 11, 18, 23

*Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*,
    559 F.3d 1308 (Fed. Cir. 2009)................................................................25

*DDR Holdings, LLC v. Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014)................................................................22

*Elec. Power Grp. LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)................................................................15

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016)...........................................................4, 10, 16, 17

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018)................................................................15

*i.e.*, *Addiction and Detoxification Institute LLC v. Carpenter*,
    620 F. App'x. 934 (Fed. Cir. 2015) ........................................................28

*Intell. Ventures I LLC v. Capital One Bank (USA)*,
    792 F.3d 1363 (Fed. Cir. 2015)...............................................................6, 15

*Intell. Ventures I LLC v. Erie Indem. Co.*,
    850 F.3d 1315 (Fed. Cir. 2017)................................................................11

*Intell. Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2016)...............................................................7, 12

*Intell. Ventures II, LLC v. FedEx Corp.*,
    No. 2:16-CV-00980-JRG, 2018 WL 7823098 (E.D. Tex. May 10, 2018) ........................4, 16

*Intellectual Ventures I LLC and Intellectual Ventures II LLC v. American Airlines, Inc.*,
    Civil Action No. 4:24-cv-00980-ALM ...............................................27, 28, 31

*JVC Kenwood Corp. v. Nero, Inc.*,
    797 F.3d 1039 (Fed. Cir. 2015)................................................................28

*Packet Intel. LLC v. NetScout Sys., Inc.*,
    965 F.3d 1299 (Fed. Cir. 2020)................................................................16

*Ravgen, Inc. v. Natera, Inc.*,
    No. 1:20-CV-00692-ADA, 2024 WL 150960 (W.D. Tex. Jan. 12, 2024) ........................7, 24

*Raytheon Co. v. Cray, Inc.*,
    No. 2:16-CV-00423-JRG-RSP, 2017 WL 1362700 (E.D. Tex. Mar. 13, 2017) ...................27

*Sanderling Management Ltd. v. Snap, Inc.*,
    65 F.4th 698 (Fed. Cir. 2023) ........................................................................21, 22

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
    930 F.3d 1295 (Fed. Cir. 2019)..................................................................2, 6, 22

*Swarm Technology LLC v. Amazon.com, Inc.*,
    561 F. Supp. 3d 861 (D. Ariz. 2021) ................................................................21

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016)......................................................................11

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016).................................................................10, 11

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017).................................................................5, 6

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.*,
    957 F.3d 1303 (Fed. Cir. 2020).......................................................................16

*Versata Software, Inc. v. NetBrain Techs., Inc.*,
    No. 13-676-LPS-CJB, 2015 WL 5768938 (D. Del. Sept. 30, 2015) ........................11

*Visual Memory, LLC v. NVIDIA Corp.*,
    867 F.3d 1253 (Fed. Cir. 2017).......................................................................11

*WirelessWerx IP LLC v. OnStar, LLC*,
    No. 2:23-cv-11501-MAG-APP, 2024 WL 1607018 (E.D. Mich. Apr. 12,
    2024) ...............................................................................................28

**Statutes**

35 U.S.C. ...........................................................................................25

35 U.S.C. § 101 ......................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 12 ...................................................................................2

Fed. R. Civ. P. 12(b)(6)......................................................................1, 2, 28

## I.    <u>INTRODUCTION</u>

The Court should reject Southwest's Rule 12(b)(6) Motion to Dismiss ("Motion" or "Mot.") in its entirety. ***First***, the asserted claims of U.S. Patent Nos. 7,257,582 ("'582 Patent"), 7,712,080 ("'080 Patent"), 7,721,282 ("'282 Patent"), 8,332,844 ("'844 Patent"), and 8,407,722 ("'722 Patent") are valid under 35 U.S.C. § 101 because they are not directed to abstract ideas, but rather specific technical solutions to technical problems. Further, the Patents recite inventive concepts, and there is a factual dispute as to whether the limitations recited in those asserted claims were well-understood, routine, or conventional to a person of ordinary skill in the art at the time of the invention. ***Second***, Southwest's argument to dismiss pre-suit damages for all asserted patents ignores case law that no marking requirement applies to method claims and is premature because Southwest has not met its burden to identify specific product(s) it reasonably believes practices the asserted patents. ***Third***, IV's infringement contentions are supported by plausible factual allegations based on public information that more than satisfy any pleading requirements. Southwest's arguments fail because IV has identified non-authorized uses of the asserted cloud patents and has sufficiently defined the accused Southwest products and services.

## II.    <u>BACKGROUND</u>

On December 22, 2025, Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively, "IV") filed their Amended Complaint ("AC") against Defendant Southwest Airlines Co. ("Southwest") in the Northern District of Texas, alleging infringement of eight patents. Dkt. 97. In its AC, IV identified specific claim limitations that were "novel and non-obvious and recite elements and steps that were not routine or conventional at the time of the invention, either individually or in combination." *See* Dkt. 97 at ¶¶ 43 ('844 Patent), 59 ('722 Patent), 107 ('582 Patent), 123 ('080 Patent), 155 ('282 Patent).

On January 5, 2026, Southwest filed this Motion to Dismiss ("Motion") the AC, alleging (i) that five of the asserted patents are not patent-eligible under 35 U.S.C. § 101; (ii) IV is precluded from seeking pre-suit damages due to an alleged failure to mark; and (iii) IV fails to plead infringing uses for the asserted cloud patents. Dkt. 100.

## III.    LEGAL STANDARDS

Patent eligibility is a question of law that depends on underlying issues of fact. *See Berkheimer v. HP, Inc.,* 881 F.3d 1360, 1365 (Fed. Cir. 2018). "[P]atent eligibility may be resolved at the Rule 12 stage only if there are no plausible factual disputes after drawing all reasonable inferences from the intrinsic and Rule 12 record in favor of the non-movant." *See, e.g., Coop. Ent. Inc. v. Kollective Tech., Inc.,* 50 F.4th 127, 130 (Fed. Cir. 2022). *Id.* Courts apply the two-step *Alice* test to determine whether patent claims are patent-eligible. At step one, courts consider "whether the claims at issue are directed to a patent-ineligible concept such as an abstract idea." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1303 (Fed. Cir. 2019). "To determine the focus of the claimed advance at *Alice* step one, we look to whether the claims are directed to a specific means or method that improves the relevant technology rather than simply being directed to a result or effect that itself is the abstract idea." *Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1379 (Fed. Cir. 2024) (internal quotation marks omitted).

If the court concludes that the claims are not directed to a patent-eligible concept, the court will proceed to step two and "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *SRI Int'l*, 930 F.3d at 1303 (quoting *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014). The Federal Circuit has repeatedly recognized that "[d]etermining whether the [invention] is well-understood, routine, or conventional is a question of fact that cannot be resolved at the Rule 12(b)(6) stage." *See, e.g., Coop. Ent.,* 50 F.4th at 133.

2

IV.  **ARGUMENT**

A.  **Each of the '582,'844,'282, '722, and '080 Patents are Patent Eligible under § 101.**

As described below, each of the '582,'844, '282, '722, and '080 Patents recite patentable subject matter under § 101. Alternatively, there are plausible factual disputes that defeat Southwest's Motion. *See supra, Coop. Ent.,* 50 F.4th at 130; *see* also Dkt. 97 at ¶¶ 43, 59, 107, 123, 155.

1.  **The '582 Patent Is Valid Under 35 U.S.C. § 101.**

a.  The '582 Patent Is Not Directed to an Abstract Idea.

The '582 Patent discloses techniques for parallelization of data processing tasks, increasing the speed of execution of processes, and balancing the loads of computer resources during execution. The invention of independent claim 1, including its non-routine and unconventional steps, recites in part "[a] method of effecting on a preexisting input file a computer-executable process comprised of a plurality of subtasks, the method comprising the steps of: (a) automatically determining file allocation and logically subdividing records of said input file into a plurality of partitions; (b) ***distributing descriptions of all of said partitions to each of a plurality of subtask processors***; (c) ***simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions with each subtask reading and processing the respective partition so as to process the respective partition*** and produce respective subtask output and; (d) ***thereafter repeating step (c) in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis***; and (e) generating at least one output combining all of the subtask outputs and reflecting the processing of all of said subtasks." (Dkt. 97-5 ("'582 Patent") at 6:44-64.

Claim 1 discloses an improvement in data processing through improvements in the use of parallelization, *i.e.*, using multiple computers or computing resources to perform a given task. *See* '582 Patent at 1:33-38. The improvements captured by claim 1 address known technical problems in "split[ting] the performance of a given task among a plurality of processing units": "[t]he load imposed on the various computers … is normally the result of the activities directed specifically to these computers and the fact that one of them is especially loaded while others are relatively idle"—this imposed load "*does not affect the way work is distributed between them*." *Id*. at 1:14-17, 1:29-33 (emphasis added). The specification explains that the '582 Patent invention allows for the use of multiple computers to optimize execution of processes and improve parallelization by "taking the available capacity of each of these computers into account while optimizing execution," "improv[ing] processing efficiency of certain processes, and improving "processor utilization." *Id*. at 1:48-57. These improvements to parallel computing are captured in claim 1, as confirmed by the '582 Patent file history, as described below. The technical solutions reflected in claim 1 of the '582 Patent provide specific benefits to the '582 Patent technical environments. *See id*. at 2:30-38. The claims of the '582 Patent thus recite a specific technological solution to problems unique in computer processing. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) ("our conclusion … is bolstered by the specification's teachings that the claimed invention achieves other benefits over conventional [technology]"); *see also Intell. Ventures II, LLC v. FedEx Corp.*, No. 2:16-CV-00980-JRG, 2018 WL 7823098, at *4 (E.D. Tex. May 10, 2018) ("specific technologic modifications to solve a problem or improve the functioning of a known system generally produce [non-abstract] patent-eligible subject matter.").

Southwest's argument fundamentally fails because it mischaracterizes the '582 Patent file history in attempting to argue that the applicant admitted that the "primary difference" over the

prior art is the use of the recited "first-come/first-served" ("FCFS") execution of partitions. Mot. at 4, 5. While FCFS is one aspect of the '582 Patent invention, it is __*not*__ limited to that aspect, as shown in the highlighted passages below:

> The primary difference between the instant invention and the processes disclosed in US 5,603,028 of Kitsuregawa and 5,357,632 of Pian is that these systems rely on a special control process that uses load information to distribute the load between processors that share the load. ___With the instant invention as defined in the claims there is no such special process___. The prior art's load information is not created with the process of the instant invention. ___Instead, the load sharing is done as a byproduct of the fact that the load-sharing process take parts of the load on a first-come/first-served basis___.
>
> \*            \*            \*
>
> ___This is a major improvement since in addition to eliminating the control process it also eliminates the need to collect and maintain load information, which it is very difficult to do and almost impossible to define so as to anticipate all possible processors that might execute the subtasks___.
>
> ___The amended claims, refer to a distribution of a description of the work to be done. The sharing process can use such a description to distribute the load without a special load process___.

Appx. 13-14 (emphasis added); *see also* Appx. at 9-10. As shown, the FCFS algorithm and the distributing descriptions limitation is relevant to the '582 Patent invention.

Southwest's characterization of the alleged abstract idea for the '582 Patent, *i.e.*, "queue management technique," also fails because it does not consider the '582 Patent invention's simultaneous execution of subtasks on subtask processors on a first-come/first-served basis based on the distribution of partition descriptions. Southwest's attempted analogy of the '582 Patent invention to "break a job into smaller tasks, assign them to workers, and have workers request new tasks when finished" (Mot. at 5) fails because the '582 Patent is rooted in a specific technical improvement to a technical system (*see* '582 Patent at 1:46-2:38). *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329 (Fed. Cir. 2017), cited by Southwest, does not change this conclusion. In *Two-Way Media*, the court found that the patentee's proposed claim constructions

failed to "indicate how the claims are directed to a scalable network architecture that itself leads to an improvement in the functioning of the system." 874 F.3d at 1338. Here, claim 1 discloses improvements to the functioning of distributed execution of computer processes. *See* '582 Patent at 1:48-57. Southwest's reliance on *Capital One* (Mot. at 5) is similarly misplaced, as that case involved the abstract idea of "tracking financial transactions to determine whether they exceed a pre-set spending limit (*i.e.*, budgeting)." *Intell. Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015). That subject matter is not even remotely analogous to the '582 Patent.

The claims of the '582 Patent are better analogized to *SRI International* and *Altair Logix LLC v. Netgear, Inc.*, No. CV 20-1004-MN-CJB, 2021 WL 6424910 (D. Del. Dec. 6, 2021). In *SRI International*, the Federal Circuit found patent-eligible claims that modified "the normal, expected operation of a conventional computer network." *See SRI Int'l*, 930 F.3d at 1303-04. Similarly, in *Altair Logix*, the court found that a patent that described "particular components that are configured in a particular way" was patent eligible because it "improve[d] the way computers work." *Altair Logix*, 2021 WL 6424910, at *6. Notably, the patent at issue in *Altair Logix* required multiple processing units working together to provide the benefits of "remov[ing] redundancy and reduc[ing] cost."[1] *Id*. at *4.

Southwest's argument that the '582 Patent allegedly concedes that most of the steps recited in claim 1 were conventional (Mot. at 6) fails because the specification makes no such concessions. At most, the '582 Patent specification acknowledges various techniques for defining a "logical partition." '582 Patent at 3:37-51. This argument also fails because it does not negate the fact that

---

[1] The court also rejected arguments that the "claimed computer components and the way they interact with each other are merely 'generic' and 'employed in the conventional manner,'" where nothing in the record showed this to be the case. *See Altair Logix*, 2021 WL 6424910, at *5.

the steps recited in claim 1, considered as a whole, are novel and inventive, and there is nothing in the record to dispute this. *See* Dkt. 97 at ¶ 107.

b.    <u>The '582 Patent Recites an Inventive Concept.</u>

This Court need not reach this step. Regardless, the '582 Patent's asserted claims are directed to an inventive concept, rendering them patent eligible. *See supra* at Section IV.A.1.a. The improvements described in the '582 Patent specification and reflected in its claims render the '582 Patent claims eligible under step two. *See CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1098-1099 (Fed. Cir. 2021) (technical improvements render claim eligible at step two).

Southwest's arguments regarding the supposed conventionality of the '582 Patent fail because they are not supported by evidence and are contradicted by the '582 Patent file history. *See Ravgen, Inc. v. Natera, Inc.*, No. 1:20-CV-00692-ADA, 2024 WL 150960, at *2 (W.D. Tex. Jan. 12, 2024) ("[A]side from attorney argument, [Defendant] does not cite any evidence that the combination of the claimed elements was routine and conventional."). Southwest's arguments regarding the "conventional" nature of the limitations or ordered combination of the claims suggest, at most, a factual dispute that cannot be resolved on the pleadings. *See infra, Aatrix*; *see also Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018) ("The improvements in the specification, to the extent they are captured in the claims, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities."); *see also* Dkt. 97 at ¶ 107. The alleged authorities relied upon by Southwest, *i.e.*, *Content Extraction* and *Symantec*, failed to claim any specific improvements over prior art methods, unlike the '582 Patent. Further, ***none*** of the authorities cited by Southwest relate to parallel processing systems.

7

Further, Southwest's motion is premature because neither fact discovery nor claim construction have begun in this matter. At a minimum, fact discovery and/or claim construction is required to resolve these factual disputes. *See infra, Aatrix.*

### 2.      The '844 Patent and '282 Patent Are Valid Under 35 U.S.C. § 101.

#### a.      The '844 and '282 Patents Are Not Directed to an Abstract Idea.

The '844 and '282 Patents claim an invention that provides concrete benefits to the functioning of distributed computer systems, such as a server grid, by using common "root images" for multiple compute nodes along with distinct "leaf images" for specific computing nodes, where the data blocks of the specific compute nodes differ from the root image data blocks. Dkt. 97-1 ("'844 Patent") at 2:37-48; Dkt. 97-17 ("'282 Patent") at 2:17-58.[2] The '844 Patent invention (claim 7) further calls for the caching of portions of root images that have been accessed by at least one compute node, and the '282 Patent invention (claim 1) further calls for a union block device for interfacing between the compute node and the storage units (claim 1) to distribute the application environment, as shown below.

| 7. A method for providing data to a plurality of compute nodes, comprising: | 1. A system for distributing an application environment comprising: |
| --- | --- |
| storing blocks of a root image of said compute nodes on a first storage unit;<br><br>storing leaf images for respective compute nodes on respective second storage units, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf | a compute node comprising a computer system;<br><br>a first storage unit for storing blocks of a root image of the compute node, wherein the first storage unit comprises a first non-volatile memory, wherein the root image comprises a computer program, wherein the blocks comprise sections of data, and wherein a file of the root image comprises at least one block;<br><br>a second storage unit for storing a leaf image, the leaf image comprising new data blocks and changes to the blocks of the root image, wherein the second storage unit comprises a second non-volatile memory; and |

---

[2] The '844 Patent is a continuation-in-part of the '282 Patent.

| | |
|---|---|
| images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and<br><br>caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory. | a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node, wherein the union block device comprises a driver, wherein the union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit; the union block device comprises a low-level driver for interfacing between the first and second storage units and the file system of the compute node; and the union block device, upon receiving a write request from the compute node for a sector X, creates an appropriate persistent mapping for sector X. |

A "root image" as used in the '844 and '282 Patents is a base image of the application environment for the compute nodes. *E.g.*, '844 Patent at 2:13-14. Using Figure 3A of the '844 Patent as an example, data blocks of a root image and leaf images are stored on separate storage devices, with previously accessed root image data blocks being stored in a cache. When a compute node sends a read request, it either receives data from the cache or from a storage unit. *Id.* at 8:5-12. If the compute node accesses data not previously cached, the cache will be updated to include that data. *Id.* at 8:32-35. The merging of the root image and leaf image to create the application environment can then be performed, resulting in an application environment that appears to the compute node as one cohesive image. *Id.* at 8:13-21.

The specifications describe how the claimed invention provides a concrete improvement over existing methods for cluster computing. It describes problems, such as the creation of "a boot image on the fly involves copying the entire contents of the master image" that "will result in a large bring-up time" for a compute node. '844 Patent at 1:54-58. The specification goes on to describe that pre-creating boot images for each server in a computing cluster has improved bring-up time, but "since one often does not know in advance how many servers will ever be booted, this scheme may result in wasted disk space." *Id.* at 1:59-63. Further, updating copies of the boot

9

image across the compute nodes "is cumbersome, as it means updating a number of copies of the boot image." *Id*. at 1:64-67. Once booted, there are further inefficiencies, resulting in redundancies in compute node operations and wasted CPU resources, disk space, and bandwidth. *Id*. at 2:1-12.

The inventions, as recited in claim 7 of the '844 Patent and claim 1 of the '282 Patent, solve these prior art problems by providing a "specific improvement to the way computers operate," as embodied in the root-leaf system of application environment storage. *See Enfish*, 822 F.3d at 1336 (finding patentable a patent designed to "improve the way a computer stores and retrieves data in memory"). The claimed invention allows for updating a boot image "on the fly" without the delays that would normally result.

> By utilizing a root-leaf system of application environment storage, embodiments of the present disclosure allow creation of boot images on the fly without significantly diminishing bring-up time. This is due to the fact that creating a new boot image does not require copying the contents of the root image …. Bring up time, and access time in general, can be further improved by caching commonly accessed the portions of the root image. Moreover, updating the boot image for the entire cluster simply involves updating the root image. Additionally, because of the commonality of the root image and the fact that its contents are not directly changed, certain operations performed on the root image (e.g., indexing) only need to be performed once by one compute node.

'844 Patent at 2:49-3:2. These improvements are directly tied to the invention, which resolves prior art problems by storing a single root image, and only storing leaf images of data not contained in the root image, as well as caching portions of the root image ('844 Patent) and using a union block device for interfacing between the compute node and the storage units to distribute the application environment and merge blocks of the root image with blocks of the leaf image ('282 Patent).

Southwest attempts to oversimplify the claimed invention by describing it as directed to the "abstract idea of organizing and storing information" using a "root-leaf structure." This is the precise sort of oversimplification the Federal Circuit has repeatedly rejected. *See supra, Contour IP Holding*; *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (same).

Indeed, the patents describe that the inventions are not just the "root-leaf" structure, but also the use of root image caching and indexing ('844 Patent) and union block device merging techniques ('282 Patent) for distributed application management. Southwest's cited cases to support its argument that the '844 and '282 Patents are allegedly directed towards "central record" keeping are readily distinguishable.[3] The inventions of the '844 and '282 Patents are instead more akin to that involved in *Visual Memory, LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017). In *Visual Memory*, the Federal Circuit held that an improved memory system that "obviate[d] the need to design a separate memory system for each type of processor, which proved to be costly and inefficient, and, at the same time, avoid[ed] the performance problems of prior art memory systems" was patent-eligible. *Id.* at 1259. So too, here, the '844 and '282 Patent inventions provide a solution for cluster computing using the root-leaf system with a cache for repeatedly requested data, avoiding the problems of prior art solutions.

    b.  The '844 Patent and '282 Patent Recite an Inventive Concept.

  This Court need not reach step 2 of the Alice test given that the '844 and '282 Patents are not directed to an abstract idea. Regardless, the '844 and '282 Patents capture inventive concepts that would make them patent-eligible under step two, even if Southwest had met its burden under step one. *See supra*, Section IV.A.2.a; *see also supra*, *CosmoKey*. The claims of the '844 and '282

---

[3] *See Synopsys, Inc. v. Mentor Graphics Corp.,* 839 F.3d 1138, 1147 (Fed. Cir. 2016) (finding the claims of the patents at issue were "devoid of any reference to a computer or any other physical component"); *Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1327 (Fed. Cir. 2017) (claims were not directed to improvement in computer function, but rather simply the use of an index for performing search); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (no improvement claimed); *In re TLI Commc'ns*, 823 F.3d at 611 (claims of asserted patent were not directed to an improvement in digital imaging); *Versata Software, Inc. v. NetBrain Techs., Inc.*, No. 13-676-LPS-CJB, 2015 WL 5768938, at *7 (D. Del. Sept. 30, 2015) (hierarchical representation of information claimed not analogous to '844 Patent's specific implementation of system of application environment storage that provides technical improvement over prior art).

Patents are analogous to those found to contain an inventive concept in *Amdocs*,[4] where the Federal Circuit expressly noted that even though a claim contained "conventional components," it nevertheless "involves limitations that when considered individually and as an ordered combination recite an inventive concept through the system's distributed architecture." *Id*. at 1302. To the extent the '844 and '282 Patent claims even use "standard" methods, they further recite the inventive concept of using a root-leaf structure and block-level distributed application management. Additionally, the specific improvements that result from this inventive concept are similar to those that prohibited dismissal in *Berkheimer*. *See id.*, 881 F.3d at 1369 (finding that an "inventive feature that stores parsed data in a purportedly unconventional manner" and the resulting benefits of the elimination of redundancies and storage requirements, improvements in system efficiency, and the ability to propagate a single edit throughout multiple documents presented a factual dispute concerning whether the invention was routine and conventional). Southwest's arguments regarding the "conventional" nature of the limitations or the ordered combination of the claims suggest, at most, a fact dispute that cannot be resolved on the pleadings.[5] *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018); *see also supra, Coop. Ent.*; *see also* Dkt. 97 at ¶¶ 43, 155 (identifying specific limitations that were not well-understood and not conventional). Further, Southwest's motion is premature because

---

[4] *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1302 (Fed. Cir. 2016).

[5] Southwest's reliance on *Content Extraction* is misplaced. Mot. at 10-12. There, the claim was directed to the "use of a generic scanner and computer to perform well-understood, routine, and conventional activities commonly used in industry," and no improvement or benefit over prior art was asserted. *See Content Extraction*, 776 F.3d at 1348. The claims in *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016) were directed to the simple filtering of emails and did not improve computer functioning. Here, in contrast, the '844 and '282 Patent claims provide a concrete technical improvement over prior art systems for distributed computing systems.

neither fact discovery nor claim construction have begun in this matter. At a minimum, fact discovery and/or claim construction is required to resolve these factual disputes. *See supra, Aatrix.*

### 3. The '722 Patent Is Valid Under 35 U.S.C. § 101.

#### a. The '722 Patent Is Not Directed to an Abstract Idea.

The '722 Patent generally relates to a dynamic content routing network that routes update messages including updates to properties of live objects to clients. The '722 Patent discloses and claims systems and methods that address technical problems that are inherent in and derive from prior art methods and systems involving the problems of dynamically updating content at a client device. For example, the '722 Patent describes "substantial limitations" with "dynamically updating content in a web page at a client device," including a lack of "efficient updating of data at the client devices."' Dkt. 97-2 ("'722 patent") at 2:17-35. The '722 Patent also describes various prior art attempts to address these problems. One method involves "simple web programming techniques" for attempting to update content on a client device, such as relying on "user action" (such as pressing the 'refresh' button" or on automation, where content is updated according to a particular schedule (such as "every 'X' seconds")). *Id.* at 2:36-44. But this automated technique is "very wasteful" because the "web server must resend the page even if nothing has changed, and, even when something has changed, it must resend the entire web page rather than just the updated information, which may be only a very small part of the page." *Id.* at 2:46-50. Additionally, any decrease in request frequency decreases the value of the data—an "unalterable trade off in a client-driven approach." *Id.* at 2:50-53. Another potential solution in the prior art was to place information likely to require updating in a separate frame, including using "custom JAVA applets to limit refreshing to individual components on a page." *Id.* at 2:57-59. But "[c]ustom applets require a large separate development effort for each item on each page that might need to be updated," and most "still update content based upon client-driven requests, although it is possible

to design an applet that accepts 'pushed' messages.'" *Id.* at 2:63-67. As the specification explains, "[t]his solution is not scalable to provide updated information for large numbers of client devices and for large numbers of web pages." *Id.* at 3:1-3.

The '722 Patent addresses this technical problem and others with a technical solution that is described in the specification and captured by the asserted claims, including claim 14. The invention of the '722 Patent comprises "a dynamic content routing network that routes messages containing data for updating properties of live objects to clients displaying web pages or other representations of data containing the live objects." *Id.* at 3:9-13. Importantly, "[t]he web server that initially provides the web pages to the clients does not need to track which clients are currently displaying the live objects. Instead, the information provider or a dynamic content provider (generically referred to as an 'input source') that provided the live object simply sends an update message to the routing network." *Id.* at 3:13-18. This solution uses bandwidth efficiently, only sending update messages to clients when live objects change. *Id.* at 3:18-20.

Claim 14 recites the following limitations:

A method comprising:

providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and causing the client device to respond to the live object of the data representation by determining an object identifier (ID) of the live object and to register for updates of the live object with the routing network, ***such that registering the client device with the routing network provides client connection information to a node in the routing network***; and

sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data that updates a property of the live object,

wherein a gateway device at the routing network is configured to ***identify a category of the update message based on the input source***, to determine a node

type to which the identified category maps, and to route the update message to the node, having the node type, at the routing network,

wherein ***the node is configured to identify the client device as a registered device*** and to route the update message to the client device, and

wherein the client device processes the update message upon receipt to update the property of the live object at the client device.[6]

In plain terms, when a client device receives data that includes a live object, such as a sports game score, the client device registers for updates with a node in a routing network. When the source of the live object sends an update (i.e. the score changes), the routing network directs the update to a specific node, which then routes the update to the registered client device. Thus, the user does not need to manually refresh or use unnecessary bandwidth automatically refreshing at set interval, unlike in prior art solutions for updating information, as described above.

Southwest suggests that Claim 14 is directed to nothing more than the "abstract idea of subscription-based content distribution to registered recipients when new information becomes available."[7] Mot. at 14. Southwest ignores entirely the technological improvement provided by the '722 Patent invention, describing it merely as "improving the speed or efficiency of a longstanding information practice," in order to analogize it to inapposite cases.[8] Mot. at 15. But the specification

---

[6] The examiner stated in the reasons for allowance that the prior art did not "disclose and/or fairly suggest at least claimed limitations in independent claim 1 and similarly recited in such matters in other independent claims," including current claim 14. Appx. 33.

[7] Southwest's characterization of the '722 Patent file history as reflecting a purported "abstract, software-based nature of the claims" (Mot. at 14) fails because the Federal Circuit has held countless times that "[c]omputers are improved not only through changes in hardware; '[s]oftware can make non-abstract improvements to computer technology." *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1347 (Fed. Cir. 2018), *as amended* (Nov. 20, 2018) (quoting *Enfish*, 822 F.3d at 1335); *see also Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1304 (Fed. Cir. 2018) (finding patent that "enables more flexible and nuanced virus filtering" patent-eligible).

[8] *See Capital One*, 792 F.3d at 1367–70 (holding that "budgeting using a 'communication medium' (broadly including the Internet and telephone networks)" was an abstract idea); *Elec. Power Grp. LLC v. Alstom S.A.*, 830 F.3d 1350, 1353–56 (Fed. Cir. 2016) (claims directed to abstract ideas

makes clear that the technological problem prior to the invention was that it was not known to update a live object when that object changed in a manner described in the specification and captured by the claims, as described above. *See Enfish, LLC*, 822 F.3d at 1337 (explaining that benefits of claimed invention over conventional technology supports the conclusion that claims are not directed to an abstract idea); *FedEx Corp.*, 2018 WL 7823098, at *4 (improving functioning of a known system is generally patent-eligible).

The '722 Patent invention provides a solution to this problem, specifically through the method steps of the claims, which expressly describe how the routing network only sends an update message for a live object to client devices based on the category of the input source of the update and subject to whether the client devices are registered. *See Packet Intel. LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1309–10 (Fed. Cir. 2020) ("The specifications explain that known network monitors were unable to identify disjointed connection flows to each other, and the focus of the claims is a specific improvement in computer technology: a more granular, nuanced, and useful classification of network traffic."); *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1308 (Fed. Cir. 2020) ("[T]he claimed invention changes the normal operation of the communication system itself to 'overcome a problem specifically arising in the realm of computer networks.'"). Further, the specification, contrary to Southwest's assertions, provides specific technical means for the claim limitations. *Packet Intel.*, 965 F.3d at 1309 (claims must be read "in light of the specification"). For example, with respect to registering the "object identifier" of the live object, the specification provides both specific code ('722 Patent at 14:13-22) and a schematic for an HTTP message (*id.* at 14:63-15:4).

---

that use computers as tools); *Content Extraction,* 776 F.3d at 1347 (no improvement or benefit over prior art was asserted).

Southwest's argument that the invention relies "entirely on conventional technology" also fails. As an initial matter, the Federal Circuit has repeatedly counseled that using conventional components does not mean that claims are directed to abstract ideas. *See Contour IP Holding*, 113 F.4th at 1380 (noting that even if a claim "employ[s] known or conventional components that existed in the prior art at the time of the invention," that does not by itself "necessarily mean that the claim is *directed to* an abstract idea at step one"); *Enfish*, 822 F.3d at 1338 ("[W]e are not persuaded that the invention's ability to run on a general-purpose computer dooms the claims."). And Southwest's assertion that "the specification further admits that 'those skilled in the art will recognize that there are many ways' to route update messages" is misleading and devoid of context (Mot. at 14 (quoting '722 Patent at 16:28-30)). Southwest ignores that immediately following this passage, the specification explains that messages can be sent to every node, or only to selected nodes, describes difficulties with selectively sending messages, and explains two approaches for addressing them: (1) "us[ing] a hierarchy of registries at the gateways and nodes to respectively keep track which messages to send to the nodes and clients" or (2) "assign[ing] messages to one or more categories, assigns nodes to one or more types, and maintains mappings between categories and types" via client proxies. '722 Patent at 16:30-46. In summary, the '722 patent is directed to a specific technical solution to a problem in the prior art and is captured in the claim limitations, rendering it patent eligible under *Alice* step one.

b.    The '722 Patent Recites an Inventive Concept.

Again, this Court need not reach step two of the *Alice* test, but the '722 Patent claims nevertheless also contain inventive concepts sufficient to make them patent eligible. Like the '844 and '282 Patents, the use of "generic computer components," as Southwest describes the claim limitations (Mot. 16), does not preclude an inventive concept. *See Amdocs*, 841 F.3d at 1302 (claim containing "conventional components" nevertheless "involves limitations that when considered

individually and as an ordered combination recite an inventive concept through the system's distributed architecture."); *see also Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) (holding patent described inventive concept despite agreeing with the district court "that the limitations of the claims, taken individually, recite generic computer, network and Internet components, none of which is inventive by itself").

But regardless of whether any of the claim limitations recite "generic" or "conventional" components, the claim's ordered combination of elements recite an inventive concept of at least updating live objects on client devices where an update message is categorized "based on the input source." *See supra*, Section IV.A.3.a. And the only portion of the specification to which Southwest cites for the proposition that this limitation is "conventional" does nothing more than state that "[t]hose skilled in the art will recognize that there are many ways to use the functionality of the routing network." *See* '722 Patent at 16:28-46. As discussed above, the specification continues on to detail specific approaches for selectively sending update messages to routing network nodes. Nor can the clear improvements of the inventive concept, arising out of the specific ordered combination of limitations, be ignored. As in *CosmoKey*, the "claimed steps were developed by the inventor[s], are not admitted prior art, and yield certain advantages over the described prior art." 15 F.4th at 1098–99 (finding claim patent-eligible because the "particular arrangement of steps in claim 1 provides a technical improvement over conventional authentication methods"). At minimum, Southwest's arguments regarding the "conventional" nature of the limitations suggests a fact dispute that cannot be resolved on the pleadings. *See Berkheimer,* 881 F.3d at 1369 ("The improvements in the specification, to the extent they are captured in the claims, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities."); *see also* Dkt. 97 at ¶ 59 (identifying specific limitations that were not well-understood

and not conventional). Further, Southwest's motion is premature because neither fact discovery nor claim construction have begun in this matter. At a minimum, fact discovery and/or claim construction is required to resolve these factual disputes. *See supra, Aatrix.*

### 4.    The '080 Patent Is Valid Under 35 U.S.C. § 101.

#### a.    The '080 Patent Is Not Directed to an Abstract Idea.

The '080 Patent generally relates to parallel distributed programs, where a parallel distributed program "operate[s] across multiple processors or nodes and multiple memories." Dkt. 97-16 ("'080 Patent") at 1:13-15, 2:8-11. The specification describes known "approach[es]" to developing parallel distributed programs, each of which have significant issues. The first approach, "message passing," allows for "different tasks and threads to operate in parallel and communicate with each other when necessary," but the "source code … [is] burdensome to develop" and "may be complicated, tedious, and error-prone" and "lose much of [its] original characteristics." *Id.* at 1:31-49. The second approach, "distributed shared memory," "alleviates the need for major changes in code structure and data structure," but is "not as efficient, because it may require a transfer of large amounts of data from the memory on [an]other processor," and "may not satisfy the need for high performance parallel programming." *Id.* at 1:53-67.

The '080 Patent addresses these technical problems with a specific, concrete solution that improves parallel distributed programs by "transform[ing]" distributed sequential programs into distributed parallel programs through the use of a "distributed shared variable located across the multiple memories and one or more distributed programs to operate across multiple processors" '080 Patent at 2:8-16, 7:36-39. A distributed shared variable ("DSV") is "logically a single variable that includes several variables that may be physically distributed across multiple memories." *Id.* at 3:37-39. The DSV "make[s] shared variable programming possible beyond shared memory that provides single-address memory space." *Id.* at 3:33-36.

19

This specific solution is captured by claim 9,[9] which recites a distributed parallel computing system with at least one memory area and processor that includes "at least one distributed shared variable capable of loading into the at least one memory area" that "is a single variable that includes several variables that may be physically loaded into the at least one memory area" and "at least one distributed sequential computing program configured to operate in the at least one processor, configured to access the at least one distributed shared variable, and configured to transform into at least one distributed parallel computing program by spawning at least one child distributed sequential computing system program when at least one intermediate condition occurs within the at least one distributed sequential program." '080 Patent at 12:3-17. The "at least one distributed parallel computing program concurrently uses the at least one distributed sequential computing program and the at least one spawned child distributed sequential computing program to perform parallel processing and/or operations." *Id.* at 12:18-22. The "at least one intermediate condition" includes "one intermediate result that will be required by the at least one spawned child distributed sequential computing program to continue computation." *Id.* at 12:23-26.

Southwest's argument that the '080 Patent is directed to an abstract idea necessarily fails because it ignores the specific solution described in the '080 Patent specification and captured by claim 9. Southwest's fundamental misunderstanding is made clear throughout the Motion, for example by its mischaracterization of the '080 Patent as a "'divide-and-conquer' [strategy] applied to computer programming." Mot. at 18. This description ignores the '080 Patent's specific improvement to distributed parallel programs, as disclosed in the specification, reflected in the prosecution history, and captured by claim 9, as described above. To make its argument work,

---

[9]  Southwest incorrectly states that IV charted claim 1 as representative. (Mot. at 18.) In fact, IV charted claim *9* in the relevant exhibit to the Amended Complaint.

Southwest must necessarily ignore the actual limitations of claim 9—this is improper. *See Contour IP Holding,* 113 F.4th at 1379-80 (courts "must avoid describing the claims at a high level of abstraction, divorced from the claim language itself" and criticizing a lower court decision because that court's decision "characterizes the claims at an impermissibly high level of generality").

To support its argument, Southwest primarily relies on *Swarm Technology LLC v. Amazon.com, Inc.*, 561 F. Supp. 3d 861 (D. Ariz. 2021) and *Appistry, Inc. v. Amazon.com, Inc.*, 195 F. Supp. 3d 1176 (W.D. Wash. 2016)*,* both of which are readily distinguishable. In *Swarm Tech.,* the court found the asserted patents directed to the abstract idea of a "scrum board," where sticky notes (tasks) are posted by a project manager on one side of a board and are then moved to the other side of the board as team members complete each sticky note. 561 F. Supp. 3d at 866. There is no such analogy here because the '080 Patent does not preempt the field of distributed parallel programming (as Southwest would allege), but rather discloses specific concrete improvements to such programming. This is reflected in claim 9, for example, through the limitations involving the "distributed shared variable" and transformation of the "distributed sequential computing program" into a "distributed parallel computing program" in the manner recited in claim 9. Southwest's example of a general contractor overseeing a construction site ignores specific technical problems arising in implementing distributed parallel programs and the concrete solution disclosed in the '080 Patent that is not analogous to either scenario. *Appistry,* which involved "receiving, stor[ing], or communicating data" and "delegating tasks" is distinguishable for at least the same reasons. 195 F. Supp. 3d at 1180. Importantly, neither *Swarm Tech.* nor *Appistry* involved a "transform[ation]," as recited in claim 9 and described above.

Southwest's reliance on *Sanderling Management Ltd. v. Snap, Inc.*, 65 F.4th 698 (Fed. Cir. 2023) is likewise misplaced. For *Sanderling,* a cursory review of the claims at issue there reveals

that they do not relate (at all) to parallel programming, but instead relate to "'providing information … based on meeting a condition," or in simpler terms "distribution of information." 65 F.4th at 703. In sharp contrast to *Sanderling,* the '080 Patent recites the "transform[ation]" of distributed sequential programs to distributed parallel programs in a manner required by claim 9 using a "distributed shared variable" that specifically improves upon the distributed parallel programs then known.

The claims of the '080 Patent are better analogized to *SRI International*, *Altair Logix,* and *Contour IP Holding.* In *SRI International* the Federal Circuit found patent-eligible claims that modified "the normal, expected operation of a conventional computer network." 930 F.3d at 1303-04. Similarly, in *Altair Logix,* the court found that a patent that described "particular components that are configured in a particular way" was patent eligible because it "improve[d] the way computers work." 2021 WL 6424910, at *6. Notably, the patent at issue in *Altair Logix* required multiple processing units working together to provide the benefits of "remov[ing] redundancy and reduc[ing] cost." *Id*. at *4.[10] And in *Contour IP Holding,* the court found that claims that focused on "specific, technological means—*parallel data stream recording* with the low-quality recording wirelessly transferred to a remote device" provided a "technological improvement to "real time viewing capabilities" and were not abstract. 113 F.4th at 1379-81 (emphasis added). Because the '080 Patent claims a "solution [that] is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of [distributed parallel programs]," it is not directed to an abstract idea. *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014).

---

[10] The court also rejected arguments that the "claimed computer components and the way they interact with each other are merely 'generic' and 'employed in the conventional manner,'" where nothing in the record showed this to be the case. *See Altair Logix,* 2021 WL 6424910, at *5.

b.    <u>The '080 Patent Recites an Inventive Concept.</u>

This Court need not reach step two because the '080 Patent is not directed to an abstract idea. Even assuming Southwest has shown this to be true (which it has not), the asserted claims of the '080 Patent are directed to an inventive concept that render them patent eligible. *See supra* at Section IV.A.4.a. The improvements described in the '080 Patent specification and carried out by the limitations of the claims render the '080 Patent claims eligible under step two. *See CosmoKey*, 15 F.4th at 1098-1099 (technical improvements render a claim eligible at step two).

As described above, the '080 Patent specification describes multiple failed attempts at improving distributed parallel programs, including message passing and distributed shared memory, and then discloses a concrete solution improving such programs that uses a "distributed shared variable" and "transform[ing]" distributed sequential programs into distributed parallel programs. *See supra,* Section IV.A.4.a. These improvements are captured in claim 9, which is confirmed by the '080 Patent file history.

During prosecution, the Applicant amended then-pending claim 15 (now issued claim 9) to include the limitation "wherein the at least one distributed parallel computing program concurrently uses the at least one distributed sequential computing program and the at least one spawned child distributed sequential computing program to perform parallel processing and/or operations." Appx. 38-39. The Applicant and Examiner then held an interview to discuss the "scope of terms 'distributed shared variable' and 'intermediate condition,'" as recited in then-pending claim 15. Appx. 47. The Applicant and examiner also agreed upon an amendment to then-pending claim 15 to overcome cited prior art, as shown below.

23

15. (Currently amended) A distributed parallel computing system, having at least one memory area and at least one processor, comprising:

at least one distributed shared variable capable of loading into the at least one memory area, wherein the at least one distributed shared variable is a single variable that includes several variables that may be physically loaded into the at least one memory area; and

at least one distributed sequential computing program, configured to operate in the at least one processor, configured to access the at least one distributed shared variable, and configured to transform into at least one distributed parallel computing program by spawning at least one child distributed sequential computing system program when at least one intermediate condition occurs within the at least one distributed sequential program, wherein the at least one distributed parallel computing program concurrently uses the at least one distributed sequential computing program and the at least one spawned child distributed sequential computing program to perform parallel processing and/or operations, wherein the at least one intermediate condition comprising one intermediate result that will be required by the at least one spawned child distributed sequential computing program to continue computation.

Appx. 58. The '080 Patent specification and file history thus confirm that the limitations in claim 9 were neither routine nor conventional. *Berkheimer*, 881 F.3d at 1369 ("The improvements in the specification, to the extent they are captured in the claims, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities.").

Southwest also fails to present any evidence that the limitations recited in claim 9 were routine and conventional. *See Ravgen, supra*. Improvements that utilize parallel computing, let alone improvements to distributed parallel computing programs themselves, may recite an inventive concept, as the '080 Patent does. *See Berkeley*IEOR v. Teradata Operations, Inc.,* 719 F. Supp 3d 842, 854-856 (N.D. Ill. 2024) (finding claims directed to "process for determining

object level profitability in a computer" using "*massively parallel computing operations* using relational database management techniques" recited an inventive concept) (emphasis added).

At minimum, Southwest's arguments regarding the "conventional" nature of the limitations suggests a fact dispute that cannot be resolved on the pleadings. *See Berkheimer,* 881 F.3d at 1369 ("The improvements in the specification, to the extent they are captured in the claims, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities."); *see also* Dkt. 97 at ¶ 123 (identifying specific limitations that were not well-understood and not conventional). Further, Southwest's motion is premature because neither fact discovery nor claim construction have begun in this matter. At a minimum, fact discovery and/or claim construction is required to resolve these factual disputes. *See supra, Aatrix.*

### B.    IV Is Not Precluded From Obtaining Pre-Suit Damages.

Southwest's arguments regarding marking are unavailing and its Motion should be denied. In the Amended Complaint, IV asserts that it does not "make or sell products and thus ha[s] no products to mark." Dkt. 97 at ¶ 168. While IV acknowledges that it has entered into license agreements, none of those agreements were to produce patented articles under the Asserted Patents, and none of the licensees agreed or admitted that they infringed those patents. *Id.* at ¶¶ 170-71. Further, IV's Amended Complaint alleges infringement for method claims for four of the eight Asserted Patents (the '844, '722, '326, and '582 Patents). "The law is clear that the notice provisions of § 287 do not apply where the patent is directed to a process or method." *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1316-17 (Fed. Cir. 2009). Southwest concedes this issue in its Motion by not substantively addressing it. Mot. at 22. For the other four patents, Southwest's argument fails because it bears the "initial burden of production to articulate the products it believes are unmarked 'patented articles' subject to [35 U.S.C.] § 287." *Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017).

Even assuming those patents are subject to § 287, Southwest has not identified any ***actual accused*** products that it "***believes*** practice the patent." *See Arctic Cat*, 876 F.3d at 1368 (emphasis added). Southwest argues that "[IV] charts the asserted patents against Spark and Hadoop systems supplied to Southwest by IV's own licensee, AWS, without patent markings[, and by] IV's own theory, those licensees are distributing practicing products without patent markings." Mot. at 23. Southwest makes a similar argument regarding "the two aircraft Wi-Fi patents," which it asserts are also licensed. *Id*. Southwest's purported *gotcha* is unavailing because IV ***expressly excluded licensed products*** from the products or systems it is accusing. *See, e.g.*, Dkt. 97-7 at 2, n.1; Dkt. 97-8 at 2, n.1; Dkt. 97-11 at 2, n.1; Dkt. 97-12 at 2, n.1; Dkt. 97-13 at 2, n.1; Dkt. 97-14 at 2, n.1. Instead, IV accuses Southwest's on-premises and unlicensed cloud implementations of the accused technologies. Southwest's transition to public cloud implementations, such as AWS, is incomplete, as shown in the Amended Complaint's claim charts. *See, e.g.*, Dkt. 64 at ¶ 41 and Dkt. 97-7 at 2. Because Southwest failed to identify any "specific unmarked products which [Southwest] ***believes*** practice the patent" other than licensed products ***expressly not accused***, Southwest's arguments fail. *Arctic Cat*, 876 F.3d at 1368. Thus, Southwest failed to meet its initial burden.

### C.    IV Plausibly and Sufficiently Pled Infringing Uses for the Cloud Patents.

IV pled sufficient facts of Southwest's direct infringement for the Cloud Patents.[11] Specifically, IV alleges Southwest systems and services use each of Docker, Kafka, Spark, and Hadoop open-source technologies that infringe at least one claim of the Cloud Patents, and IV has identified multiple Southwest engineers who work with each technology. *See generally* Dkts. 97-7 (Docker) at 2; 97-8 (Kafka) at 2, 97-11 (Hadoop) at 2; 97-12 (Spark) at 2; 97-13 at 2; 97-15 at

---

[11] For purposes of this filing, the "Cloud Patents" refers to the '844, '722, '080, '282, and '582 Patents. Southwest's Motion does not address the remaining Asserted Patents. *See* Mot. at 23.

2. In support of its allegations, IV's Amended Complaint includes element-by-element claim charts showing how Southwest infringes those technologies. *See, generally*, *id*. IV pled plausible infringement based on non-licensed use for each Cloud Patent. Specifically, IV's claim charts identify specific evidence that Southwest uses non-licensed private clouds. *See, e.g.,* Dkt. 97-7 at 2 ("Southwest [] is investing in cloud technology and has 'moved about 50% of its technology' to the [public] cloud and has indicated cloud migration is one of its areas of focus for 2024 and beyond"). This is sufficient because "an adequate complaint need only contain 'some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim'" *AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27, 35 (Fed. Cir. 2024).

Southwest does not dispute it uses (or has used) each respective technology. It instead argues IV accuses "unspecified 'services and technologies." Mot. at 24. This is incorrect; IV has identified Southwest's products and services that *use each respective accused technology*. *See AlexSam*, 119 F.4th at 35 ("it is enough that a complaint place the alleged infringer on notice of what activity … is being accused of infringement"). Further, the Southwest applications and products that use the accused technologies are not public, yet Southwest demands that IV plead knowledge of these applications and products. "[Southwest] cannot shield itself from a complaint ... by operating in such secrecy that the filing of a complaint itself is impossible." *Raytheon Co. v. Cray, Inc.*, No. 2:16-CV-00423-JRG-RSP, 2017 WL 1362700, at *4 (E.D. Tex. Mar. 13, 2017). The accused technologies are cloud technologies, and it is IV's understanding that Southwest does not make specific details of their implementation public. Thus, Southwest's demand places a burden on IV well beyond any pleading requirements. The Eastern District of Texas recently addressed similar arguments from an alleged infringer in *Intellectual Ventures I LLC and Intellectual Ventures II LLC v. American Airlines, Inc.*, Civil Action No. 4:24-cv-00980-ALM,

August 19, 2025. (Appx. 49-52) The Eastern District held that despite defendant's arguments that "the Complaint does not identify unauthorized use of the Cloud Computing Patents," IV had "stated plausible claims for relief under Rule 12(b)(6). Dismissal is unwarranted." (*Id*. at 4).

The cases upon which Southwest relies upon, *i.e.*, *Addiction and Detoxification Institute LLC v. Carpenter*, 620 F. App'x. 934 (Fed. Cir. 2015), *WirelessWerx IP LLC v. OnStar, LLC*, No. 2:23-cv-11501-MAG-APP, 2024 WL 1607018 (E.D. Mich. Apr. 12, 2024), and *Celgard, LLC v. Shenzhen Senior Technology Material Co. (US) Research Institute*, No. 19-cv-05784-JST, 2020 WL 7392909 (N.D. Cal. July 23, 2020) (Dkt. 68 at 19) do not support Southwest's position. In *Carpenter*, the Federal Circuit found that the plaintiff's statement that the defendant's making, selling, and using of "electric motors," without more details, did not satisfy its pleading burden. 620 F. App'x at 936 ("[i]t is not enough to say 'you infringe my patent' [and] that is all that is alleged in [plaintiff's] complaint."). Here, IV provided detailed claim charts including element-by-element analyses with supporting descriptions and citations to evidence. *OnStar* is also inapposite because IV "plausibly demonstrate[ed] actual use by [Southwest]" of the accused cloud technologies, which Southwest does not dispute. In *OnStar*, by contrast, plaintiff merely accused all OnStar products of infringement and included analysis of a non-party application without "offer[ing] any explanation of the relationship between OnStar and [the third-party and its application]." *OnStar*, 2024 WL 1607018, at *6. *Celgard* is likewise inapplicable because the specific products and services that use the accused cloud technologies are not publicly known. *See Celanese Int'l Corp. v. Anhui Jinhe Indus. Co., Ltd.*, No. 20-1775-LPS, 2021 WL 7209494, at *4 (D. Del. Dec. 10, 2021) ("Plaintiffs cannot be charged with knowing, at the time they drafted their Complaint, non-public information they could only obtain after filing suit and obtaining discovery"). Southwest's reliance on *JVC Kenwood Corp. v. Nero, Inc.*, 797 F.3d 1039, 1045 (Fed.

Cir. 2015) is similarly misplaced because this is not a situation where a patentee licensed its patents through "patent pools" as part of an "extensive licensing program." Mot. at 25.

Southwest argues IV's direct infringement allegations are "rendered implausible" by IV's acknowledgement that certain entities may be licensed to the Cloud Patents (Mot. at 24), but IV pled sufficient plausibility of infringement at least through Southwest's use of private clouds—*a fact that Southwest tellingly never denies* in its Motion. Further, Southwest is on notice of the accused infringing activity because IV is accusing all of Southwest's non-licensed implementations of Docker, Kafka, Spark, and Hadoop as infringing the Cloud Patents. If it is a licensed implementation of those technologies, then it is not accused. Licensed implementations are expressly excluded from IV's allegations of infringement, as described above. Further, Southwest's cursory argument to dismiss IV's enhanced damages claims fails because it is premised entirely on whether IV plausibly pled direct infringement of the Cloud Patents. Mot. at 25, n.2. As described above, IV sufficiently pled Southwest infringed the Cloud Patents.

V.    **CONCLUSION**

For the foregoing reasons, Southwest's Motion should be denied in its entirety.

Dated: February 4, 2026                              RESPECTFULLY SUBMITTED,


                                                     By: */s/ Jonathan K. Waldrop*
                                                         Jonathan K. Waldrop (CA Bar No. 297903)
                                                         (Admitted *pro hac vice*)
                                                         jwaldrop@kasowitz.com
                                                         Marcus A. Barber (CA Bar No. 307361)
                                                         (*Pro hac vice* forthcoming)
                                                         mbarber@kasowitz.com
                                                         John W. Downing (CA Bar No. 252850)
                                                         (*Pro hac vice* forthcoming)
                                                         jdowning@kasowitz.com
                                                         Heather S. Kim (CA Bar No. 277686)
                                                         (Admitted *pro hac vice*)
                                                         hkim@kasowitz.com
                                                         ThucMinh Nguyen (CA Bar No. 304382)
                                                         (*Pro hac vice* forthcoming)
                                                         tnguyen@kasowitz.com
                                                         Jonathan H. Hicks (CA Bar No. 274634)
                                                         (Admitted *pro hac vice*)
                                                         jhicks@kasowitz.com
                                                         **KASOWITZ LLP**
                                                         101 California Street, Suite 3950
                                                         San Francisco, California 94111
                                                         Telephone: (415) 421-6140
                                                         Facsimile: (415) 358-4408

                                                         Jeceaca An (NY Bar No. 5849898)
                                                         (*Pro hac vice* forthcoming)
                                                         jan@kasowitz.com
                                                         **KASOWITZ LLP**
                                                         1633 Broadway
                                                         New York, NY 10019
                                                         Telephone: (212) 506-1700
                                                         Facsimile: (212) 506-1800

                                                         Paul G. Williams (GA Bar No. 764925)
                                                         (Admitted *pro hac vice*)
                                                         pwilliams@kasowitz.com
                                                         **KASOWITZ LLP**
                                                         1230 Peachtree Street, N.E., Suite 2445
                                                         Atlanta, Georgia 30309
                                                         Telephone: (404) 260-6102
                                                         Facsimile: (404) 393-9752

William D. Ellerman (TX Bar No. 24007151)
wellerman@CJSJLAW.com
**Cherry Johnson Siegmund James PLLC**
8140 Walnut Hill Lane, Suite 105
Dallas, TX 75231
Telephone: 254-732-2242
Facsimile: 866-627-3509

Mark D. Siegmund (TX Bar No. 24117055)
msiegmund@cjsjlaw.com
**CHERRY JOHNSON SIEGMUND
JAMES PLLC**
7901 Fish Pond Rd., 2nd Floor
Waco, Texas 76710
Telephone: 254-732-2242
Facsimile: 866-627-3509

***Attorneys for Plaintiffs***
***INTELLECTUAL VENTURES I LLC***
***INTELLECTUAL VENTURES II LLC***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument was served or delivered electronically to all counsel of record on this 4th day of February, 2026, via the Court's CM/ECF system.

*/s/ Jonathan K. Waldrop*
Jonathan K. Waldrop
